THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD TACKETT, Defendant-Appellant.

First District (2nd Division)   No. 85—1029

Opinion filed December 2, 1986.—Rehearing denied January 6, 1987.

Barbara Kamm, of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter D. Fischer, and Jane H. Miller, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:
Defendant was found guilty in a bench trial of murder, armed rob-

bery, and home invasion. He was sentenced to 45 years for murder and 30 years each for armed robbery and home invasion.

Defendant appeals alleging that: (1) defendant was not proved guilty of murder beyond a reasonable doubt where it was not shown that the blows to the victim's head were a contributory cause of death and that arteriosclerosis was not an independent, superseding cause of death; (2) defendant's sixth amendment right to counsel was violated because defendant made admissions after judicial proceedings began, without a lawyer present, and without a valid waiver; (3) defendant's fifth amendment right to counsel was violated where police officers initiated a conversation with defendant after defendant had invoked his fifth amendment right to counsel; (4) defendant was not proved guilty of home invasion where defendant entered the victim's home with the belief that no one was present; and (5) the mittimus must be amended or modified where it states defendant was convicted of armed violence and defendant was convicted of home invasion.

Prior to trial, Tackett filed several motions in order to suppress his confession. In support of these motions, defendant alleged that: (1) he did not voluntarily and knowingly waive his rights before making his oral and written statements because he was in a drugged and intoxicated state; (2) he had been indicted, and waiver under *Miranda* was not sufficient to waive his sixth amendment right to counsel; and (3) defendant was told prior to making his written statement that he did not need an attorney.

At the hearing on the motions, Phillip Root and Patrick McCoy, two Longmont, Colorado, police officers, testified that on April 23, 1982, at 2:30 a.m., after receiving information from a confidential informant and contacting the Tinley Park police department, they approached defendant on the street outside his apartment. They told defendant that they wanted to talk with him at the police station about burglaries in the area. He agreed to come down to the police station.

At the station, the officers spoke to Tackett in the booking room. Tackett was told that they knew his real name was not Michael Young but Donald Tackett. The officers told defendant that they had an arrest warrant for defendant from Illinois charging defendant with homicide. Although defendant was also under indictment for murder in Illinois, the Colorado police officers were not aware of this. Officer McCoy read defendant his *Miranda* rights and asked defendant if he understood them and if he wished to talk with them. Defendant responded "yes" to both questions.

Defendant spoke for approximately 10 to 15 minutes regarding the events in Illinois. Officer Root then took defendant's fingerprints and photograph, and defendant made a phone call. Defendant was taken to the dayroom of the lockup area, and Officer Root told defendant that he would be taken to Boulder county jail and that defendant should tell the jailers that he had not eaten. He further told defendant that defendant would be held overnight at Boulder, that there would be an arraignment the following morning, and that defendant could speak to an attorney at Boulder if he wished to. Defendant responded something equivalent to "I probably should" or "I might be needing one." Officer Root told defendant that he did not think defendant needed an attorney at this time but defendant could have one if he wished to do so. Subsequent to this conversation, Officer McCoy read the *Miranda* warnings to defendant and defendant signed a statement acknowledging that he understood his rights and wished to waive them. Defendant then wrote a written statement which defendant now contends should have been excluded. It took defendant approximately 5 to 10 minutes to write the statement. The trial court found that defendant's statements were voluntary and there was no constitutional violation under the fifth, sixth, or fourteen amendments.

On December 3, 1981, Adelene Maletich repeatedly tried to reach Harvey Bailek by telephone at his home. Upon receiving no answer, Maletich went to Bailek's home. After Maletich found the window of the side door to the house was broken and the door was unlocked, she telephoned the police. Officer Phillip Valois, of the Tinley Park police department, entered Bailek's house with two other officers. The officers found Bailek's upstairs bedroom in disarray. In the bedroom there were bloodstains on the wall and carpeting. Bailek was found lying face down in a pool of blood with his hands tied behind his back in a bathroom adjacent to his bedroom. Bailek was not conscious, and his breathing was erratic and loud. He was taken to a hospital. Bailek's 1968 Plymouth Valiant was not in the garage but was later found in a field across from a restaurant several miles from Bailek's home.

Alan Kulovitz, an evidence technician with the Cook County sheriff's police department processed the crime scene. He determined that the gun-cabinet compartment in Bailek's bedroom had been pried open and there was a car jack in the corner of that bedroom. There was a bloodstain on the carpet and blood spatters on the wall. The blood spatters were of medium velocity appearing in a cast-off pattern, indicating some type of bludgeoning. Kulovitz stated that this

particular pattern indicated that a minimum of three blows were administered to the victim.

Officer Donald J. Shanto questioned Donald Dickover at the Tinley Park police station on December 5, 1981. After lengthy questioning, Dickover gave a written statement to an assistant State's Attorney. Officer Shanto then obtained a search warrant for defendant and defendant's apartment, which defendant shared with Donald Dickover. Upon execution of the search warrant, the officers found a pair of bloodstained jeans in the laundry hamper, along with a brown glove.

Donald Dickover testified that on December 3, 1981, he and defendant drove to Harvey Bailek's home at 17021 Odell Avenue. Dickover and defendant were both wearing brown gloves. They brought with them a glass cutter, a metal bar approximately 10 inches long, tape, and string. While Dickover acted as a "lookout," defendant broke the window with his hand. Both Dickover and defendant put tape on the inner door, cut the glass and broke the glass. Defendant reached inside the door and unlocked it. Then, defendant and Dickover entered Bailek's home.

Dickover and defendant went upstairs and entered Bailek's bedroom. They saw a figure lying on the bed. Dickover panicked and said, "knock him out." Defendant went over to the bed and struck Bailek with the metal bar he brought with him. Bailek awoke and said something equivalent to, "You punks, what are you doing in my house?" Bailek got up and was defending himself against defendant's blows. Defendant struck Bailek on the head three times with the metal pipe, and Bailek fell to the floor near the front of the closet.

Dickover and defendant tied Bailek's hands behind his back and dragged him into the bathroom. Dickover broke the glass in the gun cabinet and took the guns. Defendant opened the lower compartment of the cabinet with a crowbar defendant had taken from the garage. From the compartment they took a handgun, ammunition, and some coins.

They placed all the items into Bailek's car, which Tackett then drove. Dickover drove the car they arrived in. Near Gibbons' Restaurant, Bailek's car stalled so they abandoned the car, transferring the items to the other car. They took all the items to the basement of their apartment. Dickover was taken into custody on December 5. In the early morning of December 6, in a written statement, Dickover implicated defendant. Dickover stated he pleaded guilty before Judge Samuels to charges arising out of this incident and received a 45-year sentence. Dickover stated he had retained counsel to seek a reduction of his sentence through clemency. He believed his testimony would not

hurt in getting such a reduction.

Dr. Danilo Soriano testified that he examined Harvey Bailek upon his admittance to the hospital on December 3, 1981, and he continued to care for him during his hospital stay. When Bailek was admitted, he was comatose and he had some bruises on his head and paralysis on the left side of his body. A cerebral angiography showed no mass lesion of the brain.

Bailek underwent two surgical procedures while he was in the hospital: one to remove a blood clot from his left leg, the other was a tracheotomy to relieve the breathing problem he had as a result of his head injury. His level of consciousness improved and then deteriorated during his hospital stay, a clinical progression consistent with his head injury. On January 11, 1982, Bailek suffered a respiratory and cardio-pulmonary arrest resulting in his death. Dr. Soriano stated that while Bailek's death was not completely unexpected, it was confusing and there was no explanation for it in light of his examination of Bailek that morning. Yet, it was his opinion that brainstem failure caused cardiopulmonary arrest and the brainstem failure was caused by the injury to the brain.

Dr. Beamer, assistant Cook County medical examiner, performed an autopsy on Bailek on January 12, 1982. Dr. Beamer's gross exami-nation revealed an organizing bruise on the deceased's left temporal region, consistent with having received an injury 30 to 35 days before death. He testified that the brain displayed evidence of healing contu-sions on its external aspect. Yet, there was no evidence of hemorrhag-ing within the internal aspects of the brain. Dr. Beamer did a micro-scopic examination on the heart and brain. As a result, he discovered that Bailek had an enlarged heart with hardening of the arteries. In fact, he testified that the arteries were narrowed by 90%. In examin-ing the brain, Dr. Beamer did not find anything of significance.

Because Dr. Beamer was having difficulty determining the cause of death, he asked Dr. Carol Haller, a neuropathologist, to review the brain to see if he missed anything. She performed a gross examina-tion of the internal and external aspects of the brain. Her written re-port stated that there was a lesion in the corpus callosum and slit hemorrhages in the cerebral peduncle on the right side of the brain. She testified that her provisional diagnosis was that the slit hemor-rhages were likely caused by trauma. However, Haller did not include her diagnosis in her report to Dr. Beamer. Dr. Beamer read her re-port but did not attach much significance to it. Dr. Beamer stated in his autopsy report that the cause of Bailek's death was arterioscle-rotic cardiovascular disease.

Subsequently, Dr. Beamer decided to reexamine Bailek's cause of death. At his request, Dr. Haller performed a microscopic examination of the brain. In her second report, dated July 14, 1983, she stated that a lesion on the corpus callosum was primarily schemic, without blood, and the lesions in the cerebral peduncle were primarily hemorrhagic or bloody. She testified that the lesion in the corpus callosum was four to six weeks old and the lesions in the cerebral peduncle were approximately the same. However, Dr. Haller listed the age of the slit hemorrhages as being one week old. Dr. Haller also listed the age of the lesions to the corpus callosum as being three to four weeks old.

Based on her microscopic and gross examination, Dr. Haller testified that in her opinion head trauma caused the brain lesions. After consulting Dr. Haller and reviewing her July 14, 1983, report, Dr. Beamer changed his opinion as to the cause of death. He amended his original autopsy report to state that the cause of death was blunt trauma associated with arteriosclerotic cardiovascular disease. Dr. Beamer determined that the manner of death was homicide.

■ Defendant contends that defendant was not proved guilty of murder beyond a reasonable doubt where it was not shown that the blows to the victim's head were a contributory cause of death and that arteriosclerosis was not an independent, supervening cause of death. The trial court found that Harvey Bailek's death "was contributed to and caused by the blows struck by Tackett." Dr. Beamer testified that the cause of death was blunt trauma injuries associated with arteriosclerosis cardiovascular disease. However, defendant contends that the record does not establish that lesions found on Bailek's brain were caused by blunt trauma, and it was not shown that these lesions caused or contributed to Bailek's death.

It is well established that a finding of guilty will be disturbed only where the evidence is so unreasonable, improbable, or unsatisfactory as to leave a reasonable doubt as to the defendant's guilt. (*People v. Gray* (1984), 121 Ill. App. 3d 867, 870, 460 N.E.2d 354.) In a murder prosecution, proof of death and proof of criminal agency causing death must both be proved beyond a reasonable doubt. *People v. Benson* (1960), 19 Ill. 2d 50, 166 N.E.2d 80.

■■ ■ Defendant contends that the record fails to establish that lesions found on Bailek's brain were caused by blunt trauma. It should be noted that when presented with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. (*People v. Brackett* (1986), 144 Ill. App. 3d 442, 447.) Rather, the relevant question is whether, after viewing the evidence

in the light most favorable to the prosecutor, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.) The trial judge could have found beyond a reasonable doubt that the act of hitting Bailek in the head three times with a metal pipe caused slit hemorrhages within the brain.

Defendant alleges that Harvey died of arteriosclerosis. Yet, the only evidence that arteriosclerosis caused Bailek's death was contained in Dr. Beamer's first autopsy report. Upon further review of Dr. Haller's two reports of her examinations of Bailek's brain, Dr. Beamer changed his diagnosis to blunt trauma associated with arteriosclerosis. None of the expert witnesses in the case at bar testified that the cause of death was arteriosclerosis. Dr. Petty, an expert testifying for the defense, stated that Bailek died as a result of aspirating water into the trachea and lungs.

Defendant attacks the inconsistency and basis of Dr. Beamer's and Dr. Haller's findings. Defendant points out that Dr. Beamer's original microscopic analysis of Bailek's brain revealed no significant damage to the brain. Moreover, while Dr. Beamer was having difficulty in determining the cause of death, he did not attach much significance to Dr. Haller's report. Defendant notes that in Dr. Haller's second report of her microscopic findings, she listed the age of the slit hemorrhages as being one week old, while at trial she said they were approximately the same age as the lesions to the corpus callosum, which were listed as being three to four weeks old in her report. At trial, Dr. Haller claimed that this was a typo. Defendant alleges that Dr. Haller's own report is inconsistent with her claim that the age of the slit hemorrhages was one week. After stating that the lesion to the corpus collasum was three to four weeks in age, Dr. Haller stated that slit hemorrhages were more recent. Moreover, she never informed Dr. Beamer of this mistake, although she did tell him that her variables should be changed and be made longer. Defendant stresses this testimony because Dr. Beamer stated that his change in the cause of death was due primarily to Dr. Haller's neurological findings dealing with the slit hemorrhages.

■ This court is bound by the established principle that it cannot accept a conflict in the evidence as sufficient to raise a reasonable doubt of guilt. (*People v. Gray* (1984), 121 Ill. App. 3d 867, 460 N.E.2d 354.) In all situations in which experts are called to testify, their comparative credibility and the weight to be accorded to their testimony is a matter for the trier of fact to determine. (See 121 Ill. App. 3d 867, 460 N.E.2d 354.) In addition, whether or not expert tes-

timony is involved, this court has consistently held that it is the prerogative of the trial court to ascertain the truth. This court may not substitute its own feeling or judgment for the result reached by the trier of fact where the outcome of the case depends upon the weight of the evidence or the credibility. (See 121 Ill. App. 3d 867, 460 N.E.2d 354.) Defendant's contentions go to the weight and sufficiency of the evidence, and this court will not substitute its judgment for the result reached by the trier of fact where the trier of fact could have rationally determined that defendant's blows caused Bailek's brain damage.

Defendant contends that even if this court finds that defendant's blows caused slit hemorrhages to Bailek's brain, there was no evidence to show how this caused Bailek's death. The evidence at trial established that the lesions in the victim's brain were caused by blunt trauma. Dr. Haller testified that based on the pattern of the lesions and the patient's history, the cause of these lesions was blunt trauma. Dr. Haller explained that had the lesions been caused by other factors, there would have been other lesions in the brain of a similar nature. While arteriosclerosis contributed to the victim's death, a rational trier of fact could have inferred that the injuries defendant inflicted upon the victim caused his death. (See *People v. Turner* (1984), 127 Ill. App. 3d 784, 469 N.E.2d 368.) In *Turner*, the court held that defendant was proved guilty beyond a reasonable doubt of the offense of murder where eyewitness accounts attributed the beating of the victim to defendant and the medical examiner testified that the victim died as a result of blunt trauma in association with arteriosclerotic heart disease. (127 Ill. App. 784, 791, 469 N.E.2d 368.) Dr. Robert Stein, chief medical examiner of Cook County, testified that either the heart disease or the blunt trauma alone could not have caused death. The court stated that the jury implicitly found that the beating caused the victim's death, and the court could not say this finding was unsupported by the evidence.

In the instant case, defendant was proved guilty beyond a reasonable doubt of the offense of murder where eyewitness accounts attributed the beating of the victim to defendant and the assistant medical examiner testified that the victim died as a result of blunt trauma in association with arteriosclerotic heart disease.

Defendant's accomplice, Donald Dickover, testified that defendant hit the victim on the head three times with a metal pipe. Dr. Carol Haller, a neuropathologist, testified that head trauma caused slit hemorrhages in the cerebral peduncle and a lesion in the corpus callosum. Dr. Beamer, a former assistant Cook County medical examiner, testi-

fied that the cause of death was blunt trauma associated with arteriosclerotic cardiovascular disease. Dr. Soriano, the victim's treating physician, testified that the cause of Harvey Bailek's cardiopulmonary arrest was brainstem failure, caused by the head injury he received. The trial court found Bailek's death was contributed to and caused by the blows struck by defendant. This evidence is sufficient to establish criminal agency. Therefore, viewing the evidence most favorably to the State clearly establishes defendant's guilt beyond a reasonable doubt.

■ Defendant next alleges that his sixth amendment right to counsel was violated because defendant made admissions after judicial proceedings had begun, without a lawyer present and without a valid waiver. The sixth amendment right to counsel is violated when admissions are elicited in the absence of counsel from a person who has been charged with a crime. (*Massiah v. United States* (1964), 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199.) This right to counsel attaches when adversarial judicial proceedings are initiated against a defendant. (*Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877.) Once these proceedings have begun, however, the accused may make a knowing, voluntary, and intelligent waiver of his right to counsel. *Brewer v. Williams* (1977), 430 U.S. 387, 404, 51 L. Ed. 2d 424, 439-40, 97 S. Ct. 1232, 1242.

Defendant argues that the lower court failed to recognize that the sixth amendment right to counsel requires a higher standard of waiver than the fifth amendment right against self-incrimination. As both parties acknowledge, the supreme court has expressly reserved ruling on whether a higher standard than that required for *Miranda* waivers should be used to determine whether an accused has waived his sixth amendment right to counsel. (See *Brewer v. Williams* (1977), 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232; *People v. Owens* (1984), 102 Ill. 2d 88, 464 N.E.2d 261.) Lower court decisions are split. Compare *United States v. Clements* (4th Cir. 1983), 713 F.2d 1030, 1033-36; *United States v. Mohabir* (2d Cir. 1980), 624 F.2d 1140, 1146; *United States ex rel. Sanders v. Rowe* (N.D. Ill. 1978), 460 F. Supp. 1128, 1140 (waivers of sixth amendment rights require more than informing accused of *Miranda* rights and subsequent waiver of those rights), with *United States v. Brown* (5th Cir. 1978), 569 F.2d 236; *Jordon v. Watkins* (5th Cir. 1982), 681 F.2d 1067; *State v. Carter* (Me. 1980), 412 A.2d 56 (waiver of sixth amendment rights require no more than waiver of *Miranda* rights as required under the fifth amendment).

In requiring more than a knowing and intelligent waiver of the ac-

cused's *Miranda* rights, the courts in upholding a higher standard of waiver under the sixth amendment have focused on whether defendant was informed of the seriousness of the situation facing him. See *Carvey v. LeFevre* (2d Cir. 1979), 611 F.2d 19 (without knowledge of the indictment, defendant could not appreciate gravity of the situation). See *United States v. Clements* (4th Cir. 1983), 713 F.2d 1030 (defendant must be informed, at a minimum, of the fact he is under indictment). See also *People v. Owens* (1984), 102 Ill. 2d 88, 102, 429 N.E.2d 879 (sixth amendment waiver requirements met when defendant knew he was being held on a murder charge).

In *Owens,* the Illinois Supreme Court determined that, even under the higher sixth amendment standard, defendant intelligently waived his right to counsel because he was aware of the gravity of his situation. (*People v. Owens* (1984), 102 Ill. 2d 88, 102-03, 429 N.E.2d 879.) Although it was disputed as to whether the arresting officers told the accused that they had a warrant for his arrest for murder, defendant acknowledged that he knew he was being held for questioning in a murder. Therefore, the court found that the accused was aware of the severity of the situation facing him. Moreover, since the accused had been given his *Miranda* warnings, he knew he had the right to have an attorney present during questioning. The court concluded that considering these facts, together with defendant's familiarity with the *Miranda* warnings, defendant's statements were admissible.

In the instant case, there was no question that defendant was informed by Colorado's police officers of the arrest warrant issued by the State of Illinois charging him with murder. Before any interrogation took place, Officer McCoy told defendant that such a warrant had been issued for defendant. Although he was not informed by the Colorado police officers that he was indicted, defendant was informed of the nature of the charges filed against him. Therefore, defendant was aware of the severity of the situation facing him. Moreover, defendant was aware of his right to an attorney. Defendant was twice given *Miranda* warnings, once before he made his oral statement to the officers and again before defendant gave his written statement. On both occasions, defendant stated that he understood these rights and understanding them, he wished to talk to the officers. Further, defendant signed a written waiver form containing his rights under *Miranda.*

■ The trial court judge found that no sixth amendment right to counsel was violated. He concluded that "both oral and written statements are a result of the valid and intelligent waiver of defendant's rights under those sections of the constitution." While it is the State's

burden to show that the accused understood his right to counsel and knowingly relinquished it (see *Brewer v. Williams* (1977), 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232), a lower court's determinations regarding a defendant's waiver are entitled to substantial deference (*United States v. Springer* (7th Cir. 1972), 460 F.2d 1344, 1348, *cert. denied* (1972), 409 U.S. 873, 34 L. Ed. 2d 125, 93 S. Ct. 205; *Robinson v. Percy* (7th Cir. 1984), 738 F.2d 214, 222). Therefore, defendant made a knowing, voluntary, and intelligent waiver of his right to counsel under the sixth amendment.

■ Defendant next contends that his fifth amendment right to counsel was violated when the officers initiated a conversation with defendant after defendant had invoked his fifth amendment right to counsel. The trial court found that defendant did not invoke or exercise his right to counsel under the fifth, sixth, or fourteenth amendments. Officer Root testified that after defendant was taken to the Longmont police station, defendant was read his *Miranda* rights. Defendant said he understood those rights and wanted to talk to the officers. After defendant gave an oral statement, the officers informed defendant he was in custody for the charge of homicide. Officer Root testified that after the booking procedure was completed, defendant was taken to a holding area. Officer Root told defendant that he would be transported to Boulder County jail and that defendant should tell the jailers that he had not eaten. He further told defendant that defendant would be held at Boulder overnight, that there would be an arraignment the following morning, and that defendant could speak with an attorney at Boulder if he wished to do so. Defendant responded with the equivalent of "I probably should," or "I might be needing one." Officer Root told defendant that he did not need an attorney at this time but defendant could have an attorney if he wished to do so. Subsequent to this conversation, Officer McCoy read the *Miranda* rights to defendant and he signed a form stating he understood them. Defendant then wrote a written statement which he now contends should have been excluded.

Under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, a defendant invokes his fifth amendment protections when he asserts "in any manner" his right to counsel. Once the accused has invoked his right to counsel, he cannot waive this right unless he has consulted an attorney or reinitiated a conversation with the officers. (*Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.) Although many jurisdictions have interpreted this to mean that any indication by the defendant that he might wish to consult an attorney is sufficient to trigger the right to counsel, the

Illinois Supreme Court has required that a statement invoking the right to counsel be at least sufficiently free of indecision or double meaning to reasonably inform the authorities that he wishes to speak to counsel. (See *People v. Krueger* (1980), 82 Ill. 2d 305, 311, *cert. denied* (1981), 451 U.S. 1019, 69 L. Ed. 2d 370, 101 S. Ct. 3009; see *People v. Smith* (1984), 102 Ill. 2d 365, 373, 376, 466 N.E.2d 236 (Simon, J., dissenting), *rev'd on other grounds* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490.) While an assertion of the right to counsel need not be explicit, unequivocal, or made with unmistakable clarity, not every reference to an attorney, no matter how vague, indecisive, or ambiguous, should constitute an invocation of the right to counsel. (*People v. Krueger* (1980), 82 Ill. 2d 305, 311.) In *Krueger*, defendant was reported to have stated, "Maybe I ought to have an attorney," "Maybe I need a lawyer," and "Maybe I ought to talk to an attorney." The interrogators did not interpret defendant's statement as a request for counsel, and the interrogation continued and a confession elicited. The supreme court ruled that the officer's interpretation of defendant's statement was reasonable because, under the circumstances, "a more positive indication or manifestation of a desire for an attorney was required than was made here." 82 Ill. 2d 305, 312.

In the instant case, Officer Root told defendant that he was being transported to the Boulder County jail and defendant could speak to an attorney there if he wished to do so. Defendant responded something to the equivalent of "I might be needing one," or "I probably should." We find that these statements were not "sufficiently free of indecision or double meaning to reasonably inform the authorities that [the accused] wished to speak to counsel." *People v. Smith* (1984), 102 Ill. 2d 365, 376, 466 N.E.2d 236 (Simon, J., dissenting), *rev'd on other grounds* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490.

The record establishes that defendant is a person of normal intelligence, that he fully understood his *Miranda* rights, and that he effectively waived them before giving his oral and written statements. It took defendant only 5 to 10 minutes to write out the contested statement. Moreover, there is no indication that defendant was under any coercion or duress other than that inherent in every custodial setting. According to the evidence, none of the officers considered defendant's comment referring to an attorney to be a request for counsel. As the trial court noted, although the officers' subjective belief that defendant's comment was not a request for counsel is not to be given undue emphasis or weight, the officers must be allowed to exercise their judgment in determining whether a suspect has requested counsel.

(See *People v. Krueger* (1980), 82 Ill. 2d 305.) In comparing the statements made in *Krueger,* which did not constitute invocation of the right to counsel, to the statements made by defendant, the officers' judgment was correct.

Defendant's statements, "I might be needing [an attorney]," and "I probably should," made in response to Officer Root's statement that an attorney would be available in Boulder, are substantially similar to *Krueger's* statements, "Maybe I ought to have an attorney," and "Maybe I need a lawyer." Therefore, the officers did not violate defendant's *Miranda* rights, for, in this instance, a more positive indication or manifestation of a desire for an attorney was required than was made here.

Defendant contends that *Krueger* is not valid authority because it was decided one year before *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880. This contention is clearly erroneous. *Edwards* stands for the proposition that where an individual invokes his right to counsel, police cannot reinitiate a conversation with defendant to question him. The issue in *Krueger* was whether defendant's statements were sufficient to invoke defendant's right to counsel, not the consequences once the right to counsel was asserted.

Defendant further contends that the case of *People v. Rafac* (1977), 51 Ill. App. 3d 1, 364 N.E.2d 991, is factually similar to the case at hand. In *Rafac,* the accused asked how he could be represented by counsel while he was being advised of the *Miranda* warnings. After the officer told defendant that he could possibly have the public defender appointed to represent him when he went to court the following Monday, defendant asked whether he had a better chance of receiving probation if he made a statement, and the officer told him that the court looked favorably on cooperation. (51 Ill. App. 3d 1, 4, 5, 364 N.E.2d 991.) The court held that defendant indicated his desire in having an attorney present and the officer should have ceased questioning defendant.

*Rafac* is clearly distinguishable from the case at hand. In *Rafac* defendant was expressing an interest in consulting with counsel immediately. In this case, defendant's statements all dealt with his decision to seek counsel the next day in Boulder. Therefore, defendant showed no present or immediate interest in seeking counsel and consequently failed to involve his right to counsel.

■ Defendant next contends that he was not proved guilty of home invasion where defendant entered the victim's home with the belief that there was no one present. The people maintain that defendant had reason to know someone was present in the victim's

home. Illinois law provides that for a person to be found guilty of home invasion that person must "knowingly [enter] the dwelling place of another when he or she knows or has reason to know that one or more persons is present." Ill. Rev. Stat. 1985, ch. 38, par. 12—11.

Under section 4—5 of the Criminal Code of 1961, knowledge of a material fact includes "awareness of the substantial probability that such fact exists." (Ill. Rev. Stat. 1985, ch. 38, par. 4—5.) Because of its very nature, knowledge is ordinarily proved by circumstantial evidence, rather than by direct proof. (*People v. Austin* (1984), 123 Ill. App. 3d 788, 793, 463 N.E.2d 444.) However, the State must present sufficient evidence from which an inference of knowledge can be made, as the evidence must be based on established facts and not pyramided on an intervening inference. 123 Ill. App. 3d 788, 793, 463 N.E.2d 444.

There is sufficient circumstantial evidence to infer that defendant knew or had reason to know that the victim was present when they entered his home. Dickover and defendant entered Bailek's home at 1 a.m., a time when it is likely that occupants of a residence would be at home. (*People v. Austin* (1984), 123 Ill. App. 3d 788, 794, 463 N.E.2d 444.) Moreover, defendant brought string with him, from which it may be inferred that he intended to tie up anyone who was present in the house. The State argues that defendant knew Bailek was home because defendant must have seen Bailek's car in the garage when defendant went to get a crowbar to open a gun case. Defendant argues that the record does not establish the fact that Tackett went to get the crowbar before entering Bailek's bedroom. While the record is incomplete as to this question, there is enough evidence to establish that defendant was aware of the substantial probability that defendant was home.

Defendant argues that two State witnesses, Donald Dickover and Officer Root, testified that Dickover and defendant did not believe Bailek would be home that night. The trial court noted that defendant's information was given to him days before the crime. Moreover, even if defendant believed that Bailek would not be home that evening, it does not result in the conclusion that Bailek would not be home by 1 a.m. Therefore, the trial court's finding that defendant was guilty of the crime of home invasion will not be disturbed.

■ Defendant next alleges that the mittimus must be amended or modified where it states defendant was convicted of armed violence. The top portion of the mittimus is incorrect and should be modified to show that defendant was not convicted and sentenced on armed violence. Therefore, we find that the order of sentence and

commitment should be amended to read home invasion, not armed violence. See *People v. Dowd* (1981), 101 Ill. App. 3d 830, 428 N.E.2d 894.

Accordingly, the judgment is affirmed but remanded with directions to amend the mittimus to conform to the actual judgment entered below.

*Affirmed and remanded with directions.*

BILANDIC, P.J., and HARTMAN, J., concur.