THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD TORRES, Defendant-Appellant.

First District (1st Division)   No. 1—97—0828

Opinion filed June 28, 1999.

302

Rita A. Fry, Public Defender, of Chicago (Ronald P. Alwin, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Cheryl Wronkiewicz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'MARA FROSSARD delivered the opinion of the court: Defendant Edward "Easy" Torres and codefendants Timothy "Country" Davis, Michael "Red" Quinn, and Edward "White Boy Eddie" Scharringhausen were charged by indictment with the first degree murder of Rolland Stanisclaus, the attempted murder of Charles Mattison, and other offenses. Quinn pled guilty to first degree murder in exchange for a negotiated sentence of 28 years in the Department of Corrections. Davis was tried by a jury while the trial court conducted a simultaneous, severed bench trial of defendant Torres and codefendant Scharringhausen. The jury acquitted Davis on the first degree murder charge, but found him guilty of attempted first degree murder and aggravated battery with a firearm. The court acquitted Scharringhausen on all charges, but found defendant guilty of the attempted first degree murder of Charles Mattison and the first degree murder of Rolland Stanisclaus on a theory of accountability. The court sentenced defendant to two concurrent 28-year sentences in the Illinois Department of Corrections. On appeal, defendant contends that: (1) the trial court erroneously denied defendant's motion to suppress the use of his statements at trial; and (2) his conviction is inconsistent with the jury's acquittal of codefendant Timothy Davis on the charge of first degree murder and therefore must be reversed. For the reasons that follow, we affirm.

## MOTION TO SUPPRESS

Defendant first contends that the trial court erroneously denied his motion to suppress his statements. Defendant claims that the arresting and investigating officers ignored his repeated requests for an attorney. The following facts were adduced at the suppression hearing.

Judy Peterson testified on behalf of defendant. Peterson testified that on August 16, 1995, she was bartending at Tony and Lee's Lounge at 3900 N. Sheridan. At 7:30 p.m., approximately 10 or 12 police officers entered the bar and ordered all the patrons to put their hands on the bar. Peterson testified that two officers approached defendant, handcuffed him and took him out the front door of the bar with another male customer. As they led defendant out of the bar, Peterson heard defendant say "call my lawyer" and yell out a phone number. She estimated that defendant was approximately six to eight feet away from her at that time.

On cross-examination, Peterson admitted that as defendant yelled out "call my lawyer" and recited the phone number, she could not see

his face and did not know whether he was speaking to her. She also stated that she did not know Tony and Lee's Lounge to be a "hangout" for the Latin Eagle street gang. She had known defendant for a "couple of years" but did not know he belonged to the Latin Eagles. She had, however, "heard it mentioned" that defendant used the nickname "Easy."

Sergeant Steven Caluris, from the Chicago police department, testified that on August 16, 1995, at approximately 7:30 p.m., he went into a bar located at 3900 N. Sheridan Road. Caluris went into the bar on other police matters, but upon entering the bar, recognized defendant as an individual wanted for questioning in a homicide investigation. Caluris noticed a black T-shirt with a gang logo on it hanging over the back of defendant's chair. Caluris and his partner, Officer Danielson, arrested defendant and transported him to the 23rd District for questioning. Caluris testified that he did not advise defendant of his rights while at the bar or at the 23rd District station. Caluris stated that defendant did not indicate to him that he wished to speak to an attorney, nor did Caluris hear defendant ask anyone else in the bar to call his attorney. Once at the 23rd District, Caluris telephoned Detective Villardita at Area 3 and then transported defendant to Area 3 headquarters at Belmont and Western. Caluris stated that he never saw defendant become ill nor did defendant ever claim to be ill while at the 23rd District.

Detective Villardita testified that on August 16, 1995, he was working in the Area 3 violent crimes unit of the Chicago police department when Sergeant Caluris contacted him by telephone. Caluris informed him that he had detained defendant at the 23rd District. Villardita asked Caluris to bring defendant to Area 3 headquarters. When defendant arrived at Area 3 headquarters at approximately 8:30 or 9 p.m., Villardita testified that he advised him of his *Miranda* rights from a Fraternal Order of Police book. Defendant indicated that he understood his rights after each was read to him. The two then discussed the murder of Rolland Stanisclaus in the presence of Villardita's partner, Detective Kaminski. At approximately midnight, an assistant State's Attorney, Laura Morask, arrived and advised defendant of his rights a second time. During the course of Morask's interview with defendant, defendant indicated that he would no longer speak without an attorney present. At that point, Morask terminated the interview and defendant used the telephone. Villardita testified that defendant never told him that he was feeling ill, nor did he appear to be ill. On cross-examination, Villardita admitted that defendant did not sign a written waiver of his rights, nor was his statement recorded.

Defendant testified that on August 16, 1995, he went to Tony and

Lee's Lounge located at 3900 North Sheridan at 5:30 p.m. He testified that Judy Peterson was bartending that evening and there were approximately 15 or 20 other patrons in the bar at that time. Later, "around 10" police officers arrived and ordered everyone to place their hands up on the bar. Defendant identified Sergeant Caluris as the officer who approached him and placed him in handcuffs. Defendant testified that as Sergeant Caluris led him out of the bar, he "turned around and asked the bartender, I tried to direct it to the bartender, to please call my lawyer and I repeated his phone number."

The officers then put defendant into a "paddy wagon" where he told the driver that he felt ill. He stated that he was taken to the gang tactical unit at Addison and Halsted, where he was kept handcuffed for an hour and a half with nothing to eat or drink. He asked Caluris if he could speak to his lawyer but Caluris merely told him to "shut up." Defendant testified that he vomited into a garbage can in front of Caluris, who then asked him if he had "swallowed any drugs or anything." In the police car on the way to Area 3, he again asked to speak to a lawyer but Caluris again told him to "shut up." Defendant testified that once he arrived at Belmont and Western, he asked Villardita for medical attention. Villardita responded by saying, "We will get to you in a little while. You don't look sick." Defendant stated that Villardita read him his rights, after which defendant repeated his request to speak to an attorney. Villardita responded by saying, "soon as you answer a couple questions for me." Later, an assistant State's Attorney arrived. Defendant stated that she did not advise him of his rights and ignored his request to speak to an attorney. She proceeded to ask him questions regarding the homicide. He was not able to make contact with an attorney until the next day.

The State called Assistant State's Attorney Laura Morask as a rebuttal witness. Morask testified that on August 16, 1995, she met with Detective Villardita and defendant at Area 3 between 11:30 p.m. and midnight. She introduced herself to defendant and advised him of his rights. She then had a conversation with defendant which lasted for approximately 35 minutes. When Morask confronted defendant with inconsistencies in his story, he stated that he no longer wanted to talk to her without an attorney present. At that time, Morask terminated the interview and defendant used the telephone. Defendant did not become sick in her presence, nor did he tell her he did not feel well. On cross-examination, Morask stated that she did not present defendant with a written waiver of rights form.

Edwardo Jiminez, defendant's last witness, testified with the assistance of a Spanish interpreter. Jiminez testified that he was at the bar when "around six" police officers arrived. The police put the

customers up against the wall, searched them and asked them for their names. The police handcuffed defendant. Moments before taking him out to the street, Jiminez heard defendant say, in English, that he wanted an attorney.

After closing argument by both sides, the court denied defendant's motion to suppress. The court found that the totality of the circumstances indicated that defendant both heard and understood his constitutional rights. The court found that defendant attempted to ask Peterson to call his lawyer, but that the evidence did not indicate that he ever directed such a request to the police. The court also found credible the officers' claims that they never heard defendant request an attorney. The court resolved the credibility issues in favor of the State and denied the motion.

## TRIAL

At trial, the State called Jeremy Delk, a former Latin Eagle gang member, as its first witness. Delk testified that in the summer of 1995, the Latin Eagle street gang went to "war" with the "GDs," otherwise known as the Gangster Disciples street gang. At that time, the Latin Eagles had approximately 25 members and defendant served as their leader. Codefendants Scharringhausen, Quinn, and Davis also belonged to the gang.

On July 10, 1995, Delk, Quinn and Davis were sitting in a doorway on Kenmore Avenue and Irving Park Road when defendant approached and announced a meeting behind Old Fogey's bar. Delk, Quinn and Davis arrived at the meeting and were joined by defendant and two other members named "Loco" and "Gypsy." Defendant told Davis and Delk to go to Gill Park to see if there were any Gangster Disciples present. Delk and Davis went to Gill Park and reported back to defendant that not only were there no Gangster Disciples at Gill Park, but that there were police and civilians there. Delk left the meeting but later returned to find Davis, Scharringhausen, Quinn and defendant still talking behind the bar. Delk testified that he saw defendant give Quinn a pistol and heard defendant tell Quinn and Davis to go to LeMoyne and "take care of business." Delk explained that "take care of business" means shoot Gangster Disciples. Davis asked Delk if he could borrow the bike that he had with him. Delk then saw Davis and Quinn walking toward LeMoyne Park. He did not see any fellow gang members for the rest of the evening.

On the next day, July 11, 1995, at approximately 5 p.m., Delk saw Quinn and Davis near Kenmore and Irving Park. Davis told Delk that he and Quinn had gone to LeMoyne and shot two Gangster Disciples and that Quinn had "done a good job." On cross-examination, Delk

admitted that the bike he gave to Davis did not belong to him but, rather, to another gang member, "Big Spooky." Delk agreed that "Big Spooky" allowed many people to borrow his bicycle. He also denied that anyone ever told him exactly who carried out the shooting at LeMoyne. Furthermore, Delk confessed to becoming a member of the Gangster Disciples a "couple of months" before trial. The parties stipulated to Delk's treatment as an inpatient with the drug rehabilitation program at Gateway House.

Charles Mattison testified that he met Rolland Stanisclaus about two weeks prior to the shooting. On July 10, 1995, he and Stanisclaus went to LeMoyne Park to play basketball while they waited for the shelter to open. The two played basketball for about an hour and then sat on the bench in the playground. As they talked, a man named Russell joined them on the bench. Approximately two or three minutes later, a teenager "came out of nowhere" on a bike and called out: "Yo. What y'all riding?" The man who had just joined them on the bench "jumped up" and responded: "I'm GD. What you riding?" Mattison testified that, at that point, the teenager rode around in circles before opening fire with a gun at the people on the bench. Mattison tried to run for cover but was shot in the leg. He testified that he heard at least four shots. He later learned from a police officer that Stanisclaus "didn't make it." Mattison tentatively identified Davis as the shooter, at both the police lineup and at trial.

Darnell Washington, a witness to the shooting, corroborated Mattison's version of the events of July 10, 1995. Washington testified that, after the shooting, he spoke to the police who arrived on the scene. At that point, however, he did not tell them that he had actually witnessed the shooting, because he "didn't want to get involved." After he spoke to the police, he went to pick up his gym bag next to the park bench and discovered a gun lying near his bag. He picked up the gun with a plastic bag and gave it to the police. At trial, Washington identified Davis as the shooter, identified the bicycle he saw Davis riding, and identified the gun that he found on the ground near his bag.

Chicago police officer Louis Danielson testified that on August 16, 1995, he was working on the regular patrol unit of the gang team in the 23rd District. Danielson knew about the homicide that had occurred on July 10, 1995, and had obtained a description of a possible offender, a Latin Eagle gang member nicknamed "Easy." Danielson testified that on August 16, 1995, he and his partner, Sergeant Caluris, arrested defendant in a bar. At the time of his arrest, defendant had a plaid shirt in his hand that Danielson described as "like a Latin Eagle gang t-shirt" that had "Easy" written on it. Danielson later

transported defendant to Area 3 headquarters, but did not recall hearing defendant ask for an attorney at any time. Danielson also stated that he did not hear defendant ask for an attorney in the bar when he and Caluris arrested him.

Detective Villardita testified that while working the afternoon shift in Area 3 violent crimes on August 16, 1995, he learned that defendant had been arrested. When defendant arrived at Area 3, Villardita and another officer, Detective Kaminski, met with him in an interview room sometime between 9 and 9:30 p.m. Villardita testified that he introduced himself and his partner and advised defendant of his rights from a Fraternal Order of Police book. Defendant spoke with the detectives about his involvement in the shooting of Rolland Stanisclaus and Charles Mattison.

Defendant told Villardita that he led a street gang known as the Latin Eagles and used the nickname "Easy." He stated that on July 10, 1995, he called a gang meeting in the area of Sheridan and Byron. He called the meeting because a fellow gang member, "Gorgo," had been shot. Defendant called the meeting to arrange a retaliation against the rival Gangster Disciples or "GDs."

Villardita testified that defendant admitted ordering Delk and Davis to go to Gill Park to look for "GDs." Defendant gave Davis a .44-caliber black revolver to take to Gill Park. Later, Davis and Delk returned and informed defendant that there were too many police at the park. Davis returned the gun to defendant, who then decided that someone should go to LeMoyne Park. Quinn volunteered to go, so defendant gave him the revolver. After they left, defendant went inside the bar. Later, Scharringhausen arrived and told defendant that he needed a change of clothes. Defendant gave him a shirt and $5 for cab fare. At that time, defendant thought that Scharringhausen had done the shooting. Two days later, defendant learned that Davis had actually fired the shots at LeMoyne Park.

After listening to defendant's story, Villardita called the State's Attorney. Assistant State's Attorney Laura Morask arrived at Area 3 and after advising defendant of his constitutional rights began to question him. Villardita testified that defendant recounted the same details to Morask. However, when Morask confronted defendant with certain information, he stated that he would no longer speak without an attorney present. Villardita testified that, at that point, Morask terminated the interview, and defendant used the telephone to make three calls. On cross-examination, Villardita admitted that defendant never signed a written waiver of his rights. Furthermore, Villardita did not write down, record or videotape defendant's statements.

Assistant State's Attorney Laura Morask testified that on August

16, 1995, she went to Area 3 headquarters regarding a different matter when she received an assignment to interview defendant. Morask met with defendant, introduced herself and advised him of his constitutional rights. Defendant then agreed to discuss the events of July 10, 1995.

Defendant admitted to being a "leader of rank" in the Latin Eagle street gang. On July 10, 1995, a fellow Latin Eagle named "Gorgo" was shot. Defendant called a gang meeting behind a bar called "Old Fogeys" to decide how to retaliate. Morask testified that defendant stated that he gave Delk and Davis a .44-caliber revolver and sent them to Gill Park to conduct a "recon mission" to look for "GDs" to shoot. Davis and Delk later returned, after observing too many police at the park. Davis then returned the weapon to defendant.

Defendant then stated that Quinn volunteered to retaliate. Defendant gave him the gun and told him to go with Davis to LeMoyne Park, because by that time enough "GDs" should have arrived so that they could find someone to shoot. Defendant stated that he told Quinn and Davis to go and "take care of business." During the course of the interview, Morask informed defendant that she had spoken to his codefendants and to Jeremy Delk. She advised defendant that his codefendants and Delk had stated that he had actually ordered the shooting at LeMoyne Park. Morask testified that, at that point, defendant stated that he wanted to see a lawyer. Morask terminated the interview and defendant used the telephone.

Defendant called three witnesses to the stand, Edwardo Jimenez, Nancy Jamshad and Jose Vasquez. All three witnesses went to Tony and Lee's Lounge on July 10, 1995, the night of the shootings. Jiminez testified that he did not see defendant leave the bar until approximately 11:30 p.m. or midnight. Jamshad and Vasquez testified that they did not see defendant leave the bar at any time throughout the evening. Defendant also entered a stipulation that Peterson, if called as a witness, would have testified as she did at the suppression hearing.

After arguments, the trial court found defendant guilty of first degree murder and attempted first degree murder on an accountability theory. The trial court sentenced defendant to two 28-year sentences to run concurrently. Defendant now appeals.

## ANALYSIS

Defendant first argues that the trial court erred in denying his motion to suppress the statement that he gave to Detective Villardita. Defendant maintains that the State did not meet its burden of establishing that the police gave him *Miranda* warnings or that he waived his right to counsel. Defendant claims that the evidence actually supports his assertion that he invoked his right to counsel and

that, accordingly, his statement should have been suppressed. Specifically, defendant claims that after Sergeant Caluris placed him under arrest at Tony and Lee's Lounge, he attempted to ask the nearby bartender, Judy Peterson, to call his attorney. Furthermore, defendant argues that the absence of any signed waiver of rights also supports his contention that he repeatedly demanded to see an attorney before answering any questions.

■ A defendant's request for an attorney is a *per se* invocation of his fifth amendment right and requires that all questioning by authorities cease. *Edwards v. Arizona*, 451 U.S. 477, 485, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1885 (1981). Once an accused invokes his right to counsel, interrogation must cease until an attorney has been provided. *People v. Curtis*, 219 Ill. App. 3d 218, 579 N.E.2d 428 (1991). Not every vague or ambiguous reference to an attorney will suffice as an invocation of the right to counsel, however. *People v. Tackett*, 150 Ill. App. 3d 406, 418, 501 N.E.2d 891 (1986). Rather, an accused's demand must be sufficiently clear and definite as to reasonably inform the authorities of the accused's intention to invoke his right to an attorney. *Tackett*, 150 Ill. App. 3d at 418.

■ In this case, defendant testified that, as Sergeant Caluris led him out of the bar, he asked the bartender, Judy Peterson, to call his attorney and then recited his attorney's phone number. At the suppression hearing, Peterson and a bar patron, Edward Jiminez, corroborated defendant's claim, although the arresting officer, Sergeant Caluris, testified that he never heard defendant make such a request. Another arresting officer, Officer Danielson, also testified that he did not recall ever hearing defendant request an attorney.

Although defendant claims that the evidence demonstrates that he invoked his right to counsel, as previously discussed, not every reference to an attorney constitutes a successful invocation of the right to counsel. Although defendant produced evidence to support his claim that he asked Peterson to call his attorney, defendant presented no evidence to support his claim that the arresting officers heard the request. Defendant himself testified that he attempted to direct the request to Peterson, rather than the officers. An accused's demand that a bystander contact an attorney on his behalf is not the equivalent of an explicit desire to speak with an attorney prior to questioning by police. See *People v. Sommerville*, 193 Ill. App. 3d 161, 169, 549 N.E.2d 1315 (1990). In fact, this court has previously interpreted such a request to serve as an inquiry into a specific attorney's availability to handle the accused's case. *Sommerville*, 193 Ill. App. 3d at 169-70. Assuming that defendant asked Peterson to call his attorney, that request in no way communicated to the police officers that he wanted

an attorney present before answering any questions. Accordingly, defendant's request did not constitute a successful invocation of his right to counsel.

Defendant further testified that, after being removed from the bar, he repeatedly informed both Sergeant Caluris and Detective Villardita that he wanted to speak with his attorney. However, Sergeant Caluris testified that defendant never indicated to him that he wished to speak with an attorney, either while at the bar or at the police station. Detective Villardita also testified that defendant did not request an attorney until after he had not only given a statement to Villardita, but after he had already spoken to the assistant State's Attorney for quite some time. At the conclusion of the suppression hearing, the trial court denied defendant's motion to suppress, stating: "The totality of the circumstances and the evidence in this case implies and means to me that [defendant] understood his rights, as he testified he knew enough to call out and say get my lawyer *** and if he had repeated that request to the police and the state's attorney they would have said so. The credibility issues go with the State and the motion is denied."

■ After observing the demeanor of the testifying witnesses, the trial court is entitled to believe the State's version of events rather than the defendant's version. *People v. Gacho*, 122 Ill. 2d 221, 238, 522 N.E.2d 1146 (1988). In determining whether the defendant invoked his right to counsel, the court must consider the totality of the circumstances, including the facts surrounding the respective versions of the interrogation. The trial court's ruling on a motion to suppress will not be disturbed unless it is manifestly erroneous. *Gacho*, 122 Ill. 2d at 237. On review, the court may consider the evidence adduced at both the suppression hearing and at trial. *People v. McClellan*, 232 Ill. App. 3d 990, 1004, 600 N.E.2d 407 (1992).

■ Here, defendant did not present any corroboration to his claim that he repeatedly asked Sergeant Caluris and Detective Villardita for the assistance of counsel. On the contrary, defendant's two witnesses corroborated that he asked the bartender, Judy Peterson, to call his attorney on his behalf. Neither witness claimed to have heard him direct a similar request to any law enforcement agent, either while in the bar or elsewhere. Sergeant Caluris, Detective Villardita and the assistant State's Attorney all contradicted defendant's claim. The trial court's finding, therefore, hinged on the credibility of the witnesses. In addition, it is undisputed that defendant received *Miranda* warnings prior to being questioned. In light of the contradictory testimony presented regarding defendant requesting counsel and defendant's own admission that he heard his constitutional rights prior to making his statement, the trial court's conclusion was not manifestly erroneous.

■ Defendant also claims that the absence of any signed waiver of rights lends credence to his version of the events. However, as discussed above, the trial court is required to look at the totality of the circumstances when assessing the voluntariness of a defendant's inculpatory statement. The court must consider the characteristics of the defendant as well as the details of the interrogation, without any one factor controlling the court's inquiry. *People v. Lopez*, 222 Ill. App. 3d 872, 876, 584 N.E.2d 462 (1991). Furthermore, an express waiver of *Miranda* rights is not dispositive of a question of voluntariness. Rather, any clear manifestation of a desire to waive one's rights is sufficient. *People v. Wright*, 171 Ill. App. 3d 573, 581, 525 N.E.2d 1165 (1988). Finally, proof of waiver beyond a reasonable doubt is not required. *People v. Rogers*, 123 Ill. 2d 487, 495, 528 N.E.2d 667 (1988).

Here, the trial court explicitly stated that, as required, it had considered the totality of the circumstances before making a ruling. In making its determination, the court observed the demeanor of the witnesses and the credibility of their testimony. The court also recounted various details of the testimony and commented upon which details factored into its decision. Absence of written waiver notwithstanding, the court ultimately found for the State. After consideration of all the evidence presented, such a determination was within the province of the trial court, was not against the manifest weight of the evidence and will not be disturbed.

Defendant also contends that his conviction for first degree murder is inconsistent with the jury verdict finding Davis not guilty on the charge of first degree murder. Defendant maintains that his conviction should be reversed because the jury verdict finding Davis not guilty of first degree murder raises a reasonable doubt as to defendant's guilt. We disagree.

■ Although defendant cites to *People v. Carter*, 19 Ill. App. 3d 21, 311 N.E.2d 213 (1974), and *People v. Beasley*, 41 Ill. App. 3d 550, 353 N.E.2d 699 (1976), to support this contention, defendant also correctly notes that this court declined to follow *Carter* and *Beasley* in *People v. Wehmeyer*, 155 Ill. App. 3d 931, 509 N.E.2d 605 (1987). In *Wehmeyer*, the court noted the general principle that in joint trials before the same triers of fact, the acquittal of a codefendant may raise a reasonable doubt as to the culpability of the defendant. *Wehmeyer*, 155 Ill. App. 3d at 943. This is particularly true when the same evidence is introduced against both defendants. *Wehmeyer*, 155 Ill. App. 3d at 943. However, this principle does not apply to separate trials in which the defendants have opted for different triers of fact. In separate trials before different triers of fact, the acquittal of one defendant is of no consequence to the trial of the codefendant. *People v. Schroeder*, 105 Ill. App. 3d 677, 680, 434 N.E.2d 546 (1982).

■ As in this case, in *Wehmeyer*, the trial court conducted a joint trial, but the defendants opted for different triers of fact. The jury found one defendant not guilty of battery, but the trial court found the codefendant guilty of battery on an accountability theory. On review, the court noted that each trier of fact brings different experience, values, and preconceptions to their assessment of the evidence presented. *Wehmeyer*, 155 Ill. App. 3d at 944. These variables may lead one trier of fact to be more lenient or less easily convinced of an individual's guilt. See *Wehmeyer*, 155 Ill. App. 3d at 944. On the other hand, the same variables may lead another trier of fact to be less tolerant or more easily persuaded of a defendant's culpability. Therefore, the critical inquiry is whether sufficient evidence supported a guilty finding by the trier of fact selected by the convicted defendant. *Wehmeyer*, 155 Ill. App. 3d at 944. If the defendant's conviction is supported by sufficient evidence, the verdicts need not be consistent. *Wehmeyer*, 155 Ill. App. 3d at 944.

In this case, Jeremy Delk testified that on July 10, 1995, he attended a gang meeting behind Old Fogey's bar. Delk testified that defendant ordered Quinn and Davis to go to LeMoyne Park and shoot members of the Gangster Disciples, a rival street gang. Delk testified that he saw defendant give a revolver to codefendant Quinn for the purpose of committing the crime. Charles Mattison testified that on July 10, 1995, a teenager opened fire on the bystanders at LeMoyne Park after one bystander identified himself as a member of the "GDs." Darnell Washington identified Davis as the shooter at LeMoyne. Detective Villardita and Assistant State's Attorney Morask both testified to defendant's statements that linked him to the crime. Accordingly, we conclude that defendant's convictions are supported by sufficient evidence and will not be reversed.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

O'BRIEN, P.J., and GALLAGHER, J., concur.