THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM WEATHERSBY, Defendant-Appellant.

First District (5th Division)   No. 83—2393

Opinion filed November 22, 1985.

Thomas Peters, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Richard A. Stevens, and Graham C. Grady, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

William Weathersby was found guilty by a jury of murder in the beating death of Katherine Gilbert, and was sentenced to a 40-year prison term. On appeal to this court defendant contends that he was denied a fair trial by the prosecution's use of a statement obtained in violation of his *Miranda* rights. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) Defendant also contends that his conviction must be reversed because the State failed to produce one of the witnesses to that statement at the motion to suppress and because the State failed to identify that person as a witness to the statement in answer to discovery. Finally defendant asserts that he was denied effective assistance of counsel.

We affirm.

The pertinent evidence at trial established the following. At 5 p.m. on October 30, 1981, Chicago police officer Allan Smith was

called to an apartment building at 2208 East 68th Street in Chicago. There he saw the defendant, apparently intoxicated, trying to get into his (the defendant's) apartment with a key. Defendant told Smith there was a dead lady inside. Smith followed defendant inside where he found streaks of blood on the floor. He searched the defendant but found no weapons.

Officer Smith followed a trail of blood into a bedroom where he found the body of Katherine Gilbert laying face up in bed. Subsequent medical testimony established she had been beaten to death. There was blood throughout the bedroom. When Smith saw that defendant had followed him he ordered him to sit on the sofa in the living room.

Smith noted that there was blood on the kitchen floor but the back door in the kitchen was securely locked with two locks. Neither the apartment windows nor the doors were damaged.

Detective Dennis Gray testified that he and his partner, Detective Charles Salvatore, were assigned to investigate this homicide. They arrived at the apartment building about 6 p.m. that evening. Gray noted that the outside entrance to the building was blocked by an eight-foot fence which required them to be admitted through an electronically controlled gate. The outer vestibule door was also locked. In the apartment Gray found a broken table leg and a tire iron, each bearing blood subsequently found to be consistent with that of the victim. There was a large pool of blood in front of the bathroom sink and rags and towels were piled next to the sink. The defendant was transported to Area 1 police headquarters, while Gray and Salvatore conducted an investigation in the neighborhood.

At about 7 p.m., according to Gray's testimony, he and Salvatore spoke to defendant in an interview room at Area 1. Defendant told them he had come home at 5 p.m. that day to find the victim's body in bed. He then went to the apartment of a neighbor, Ima Jean Walker, who called the police. The detectives then unsuccessfully searched for some of the people with whom defendant told them he had been that day.

At 11 p.m. the detectives again spoke to the defendant. They found bloodstains inside his shoes, on his socks, and on his underwear. The blood on the underwear was subsequently found to not be defendant's blood and was consistent in type with the victim's blood.

According to Gray he and Salvatore next spoke to the defendant the following day, October 31, at 6 p.m. The defendant was advised of his *Miranda* rights by Gray. Gray then left the room and Salvatore spoke to the defendant alone.

At about 10 p.m. Gray and Salvatore again questioned the defend-

ant. This time defendant stated that on October 29 after a day spent drinking vodka with various people he returned to his apartment and had several drinks with Ima Walker and the victim. Defendant stated that the next thing he remembered was waking at 8 a.m. to find the victim in a pool of blood at the foot of the bed. She was still breathing. Defendant placed her in the bed. He found blood throughout the apartment and noticed some on his clothes. He became frightened, took off his clothes, and washed the blood from his body. He then left the house. Defendant initially stated he had to unlock his front door to leave, but then said the door was not locked.

Defendant stated that he did not seek medical attention for the victim because he was frightened. He visited his sister and then began drinking on the street with some acquaintances. Defendant became worried about the victim and returned to his apartment, finding her dead. He left the apartment, discarding in an alley the clothes he had previously removed. Later he returned to the apartment, pretended to have just discovered the body, and had his neighbor, Ima Walker telephone the police.

The detectives asked defendant about the origin of the blood found on his underwear. He stated that this came from blood on his arm from a tetanus shot received at Cermak Hospital on October 28. However, at trial it was stipulated that a medical record technician from the hospital would testify that the hospital had no record of such treatment.

Ima Walker testified that she drank with defendant and the victim in their apartment from five to six p.m. on October 29, 1981. When Walker left the apartment Katherine Gilbert had no injuries. About 5 p.m. the next day she heard defendant at his door and asked him if the victim was home. Defendant said he was going to see. He went in the apartment and emerged to report the victim was dead. He then telephoned the police from Walker's phone.

OPINION

We first consider defendant's contention that his statement of 10 p.m., October 31, 1981, in which he substantially changed his account, should have been suppressed. Defendant's pretrial counsel did not attempt to suppress any of defendant's earlier exculpatory statements. At the motion to suppress the following pertinent evidence was presented.

Detective Salvatore, who did not testify at trial, testified that at 6 p.m. on October 31, 1981, he questioned defendant alone in the interview room. Salvatore first informed defendant of all of his *Miranda*

rights and defendant stated he understood them. Defendant then told of having first discovered the body at 5 p.m. October 30.

Salvatore further testified that at 10 p.m. he again began to question the defendant by himself after first informing him of his *Miranda* rights. When told he had a right to an attorney defendant stated, "You mean I can get an attorney," and Salvatore said yes. When informed that counsel would be appointed if defendant could not afford an attorney defendant stated: "You mean I can have an attorney, I can get an attorney." Salvatore responded affirmatively. Defendant then asked what was going to happen and Salvatore told him that they would seek charges against him. As Salvatore began to leave defendant asked if he needed a lawyer. Salvatore told him he was the only judge of that. Defendant then stated that if he was given cigarettes and coffee he would tell Salvatore what happened. Salvatore complied, and defendant gave the new version used against him at trial.

The trial court denied a motion to suppress this statement, finding that the defendant had specifically waived his right to counsel. However, the court did suppress two subsequent statements based on evidence that those statements were obtained by persisting in questioning defendant after he requested counsel.

As we have noted at trial, Detective Gray testified, contrary to Salvatore's suppression-hearing testimony, that he was present for defendant's statement at 10 p.m., October 31. Gray specifically testified that Salvatore read defendant his rights from a preprinted card. When asked to detail these rights Gray specified that defendant was told of his right to an attorney and the right to remain silent. Gray recalled that after defendant was told of his right to have a lawyer present defendant stated, "Oh, you mean I can have a lawyer present," and Salvatore responded affirmatively. The following sequence in Gray's trial testimony then occurred:

"[Assistant State's Attorney]: And did Mr. Weathersby say anything in response to that or ask Detective Salvatore anything?

A. At that point he said, 'Oh, I can have an attorney?' My partner—

Q. What's the next thing that happened?

A. He then—

Q. Did he ask what would happen to him? Did Mr. Weathersby ask what was going to happen to him?

A. Yes, sir.

Q. And what did he say or ask?

A. He said what was going to happen to him.

Q. Or did you and Detective Salvatore reply?

A. Detective Salvatore stated we were going to seek murder charges being placed against him."

Gray then testified that as he and Salvatore were leaving, based on their conclusion that defendant was invoking his right to counsel, defendant requested coffee and a cigarette, stating he would tell what really happened. The statement then followed.

■ It is defendant's contention that Gray's testimony establishes that defendant was not given all of his *Miranda* rights immediately prior to the 10 p.m. statement of October 31. We need not determine whether Gray's truncated testimony specifying the rights given from a printed card does establish this proposition. For it is undisputed that about four hours earlier defendant was fully informed of his *Miranda* rights and stated that he understood them. Detective Salvatore, at the suppression hearing, and Detective Gray at trial both testified to this. There was therefore no need for the *Miranda* warnings to be repeated several hours later. *People v. Hill* (1968), 39 Ill. 2d 125, 131-32, 233 N.E.2d 367, 371, *cert. denied* (1968), 392 U.S. 936, 20 L. Ed. 2d 1394, 88 S. Ct. 2305; *People v. Jones* (1984), 129 Ill. App. 3d 618, 626, 472 N.E.2d 1176, 1182.

Defendant also contends that it was improper for the police to question him after he had requested counsel. We first note that defendant's statements were not unambiguous requests for counsel, a fact that the trial court also noted in its findings. More important is the fact that as the police began to leave in deference to their perception that defendant was requesting counsel, it was defendant who initiated further communication with them.

■ When an accused has invoked his right to counsel, he may be questioned further only if the accused himself initiates further communication with the police. (*Edwards v. Arizona* (1981), 451 U.S. 477, 485, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1885.) Furthermore, the prosecution must establish that this subsequent waiver was, under the totality of the circumstances, made knowingly and intelligently. *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1046, 77 L. Ed. 2d 405, 413, 103 S. Ct. 2830, 2835; *People v. Ellis* (1985), 132 Ill. App. 3d 778, 779-80, 477 N.E.2d 720, 721-22.

■ Here, assuming that defendant's statements were properly construed as a request for counsel, it is clear that he immediately initiated a new conversation in which he waived this request. He had already been advised of his right to counsel several times and had expressed an understanding of that right. Following the 10 p.m.

statement he exhibited a full understanding of his right to counsel by invoking it twice in a manner which the trial court held required suppression of statements obtained in derogation of his requests. Under these circumstances we find no error in the trial court's determination that defendant waived his right to counsel prior to making the 10 p.m. statement on October 31, 1981.

■ Defendant also contends that his conviction must be reversed because, at the suppression hearing the State failed to produce Detective Gray, one of the material witnesses to the statement. Detective Gray's trial testimony established that, contrary to Detective Salvatore's suppression-hearing testimony, Gray was a witness to the 10 p.m. statement, but defendant did not object in the trial court to Gray's absence from the hearing and accordingly that issue has been waived. (*People v. Clay* (1981), 98 Ill. App. 3d 534, 541, 424 N.E.2d 814, 819-20.) Moreover, we find no prejudice arising from this omission. Detective Gray's trial testimony corroborated that of Salvatore concerning defendant's waiver of his right to counsel. Any variance in Gray's account of the warning given to defendant at 10 p.m. has no significance in the light of Gray's corroboration of Salvatore's testimony concerning the full *Miranda* rights having been given four hours earlier.

■ We also find no merit to defendant's contention that his conviction should be reversed because the State withheld favorable information from the defense prior to trial. The State's answer to discovery listed Detective Gray as a potential trial witness, but did not list him as a witness to defendant's statement of 10 p.m., October 31, 1981. However, when Gray's status as witness to that statement was established at trial defendant sought no sanctions and defendant did not subsequently include this omission in his motion for a new trial, thus waiving the issue. (*People v. Williams* (1981), 96 Ill. App. 3d 250, 253, 421 N.E.2d 248, 250.) Additionally, as we have indicated, Detective Gray's testimony only served to bolster the State's case on the issue of defendant's waiver of his right to counsel. Accordingly, we find no prejudice to defendant's right to a fair trial arising from the State's omission. See *People v. Ingram* (1980), 91 Ill. App. 3d 1074, 1082-83, 415 N.E.2d 569, 571.

Defendant's final contention is that he was denied his right to the effective assistance of counsel because neither his appointed counsel nor his retained counsel (obtained prior to trial) moved to quash his arrest.

■ To establish ineffective assistance of counsel a defendant must show there is a reasonable probability that but for his counsel's unpro-

fessional errors the result of his trial would have been different. (*People v. Barnard* (1984), 104 Ill. 2d 218, 237-38, 470 N.E.2d 1005, 1012.) Here defendant suggests his attorneys could have successfully challenged his arrest as not based on probable cause. Defendant was found, intoxicated, at his apartment with his live-in companion lying in bed, beaten to death. There was no sign of forced entry to the apartment. The back door was securely locked. Entry to the apartment complex itself was secured by an electronically controlled gate and a locked vestibule door. There was evidence at the scene that the killer had attempted to clean up some of the gore. Under these circumstances we find it apparent that both defendant's appointed counsel and his subsequently retained counsel determined as a matter of trial tactics not to pursue a motion to quash the defendant's arrest. In the absence of any indication that this tactical decision was indicative of incompetence we find no basis for defendant's claim of ineffective assistance of counsel. *People v. Gallardo* (1983), 112 Ill. App. 3d 764, 771, 445 N.E.2d 360, 366.

The judgment of the trial court is affirmed.

Affirmed.

·   SULLIVAN and PINCHAM, JJ., concur.