THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHRISTOPHER CARLSON, Defendant-Appellant.

Second District   No. 2—90—0662

Opinion filed February 10, 1992.

G. Joseph Weller and Barbara R. Paschen, both of State Appellate Defender's Office, of Elgin, and Kathleen T. Zellner, of Kathleen T. Zellner & Associates, of Naperville, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GEIGER delivered the opinion of the court:

The defendant, Christopher A. Carlson, was found guilty of armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—2(a)) after a jury trial and was sentenced to eight years' imprisonment. The defendant appeals his conviction, arguing (1) that the trial court erred in denying his motion to suppress statements given to the police after he requested an attorney; (2) that the court erred in denying a motion for a new trial based on the State's failure to comply with discovery; (3) that the court erred when it failed to give jury instructions tendered by the defense; (4) that the court erred in sentencing him to more than the minimum sentence; and (5) that he was not found guilty beyond a reasonable doubt.

On May 15, 1989, the defendant was working at Wag's Restaurant. That evening, an individual entered Wag's through the front door wearing a hat, a black cloth over his face, and carrying a gun and a knife. The individual took the manager, the waitresses and the defendant to the manager's office. While holding a knife at the throat of a waitress, the robber told the manager to open the safe. The robber gave a pillow case to the defendant, and the defendant filled the case with the money removed from the safe. The robber then made the employees enter a utility room and told them to remain there until he left the restaurant.

Outside the front door, the police found a black hat, a bicycle, a piece of black cloth, a knife and a $5 bill. A canine unit followed a scent to a nearby apartment complex, the Walnut Manor apartments. On May 16, the police had already identified Kerry Everett as a suspect in the robbery. Two police detectives, Klinkhamer and Jannusch, went to the defendant's home at the Walnut Manor apartments, to question him concerning the robbery and to determine if the defendant could identify Kerry Everett as the robber. At the defendant's apartment, they noticed a number of persons asleep on the floor. At the detectives' request, the defendant went to the police department to answer questions about the robbery.

During the police interview, the defendant told the detectives that Everett was an acquaintance of his and that Everett had been in his apartment on prior occasions. The defendant identified the bike found outside the restaurant as belonging to Kenneth Rogers, a friend of his who sometimes slept at his apartment. The defendant stated that the bike had recently been moved to Everett's apartment. Later that day the police received a phone call stating that Everett was at the defendant's apartment, and the police arrested Everett there.

On May 17, the defendant returned to the police department to identify items that the police had recovered from Everett's apartment. The defendant identified a replica gun, shoes, and coin trays as being connected with the armed robbery at Wag's. The detectives informed the defendant that they wished to question him again. He was read his *Miranda* rights, and the defendant signed a waiver to that effect. The defendant asked if he was under arrest and was told that he was not, but that he had been implicated as a suspect in the robbery.

The defendant admitted that he and Everett had conversations about the possibility of robbing Wag's, the amount of money kept there, and the best night to rob the restaurant. The defendant stated that these discussions only represented fantasies. Thereafter, he stated that he did not wish to talk further to the detectives. On May 26, 1989, the defendant was arrested for his involvement in the Wag's robbery. At the police station, the defendant was again advised of his rights. The defendant requested to speak to an attorney and was handed the telephone and told he could make one phone call. The defendant attempted to reach his attorney, but received no answer on the phone. According to the detectives, Detective Jannusch asked the defendant, "What do you want to do now?" The defendant stated that there was no one else he wanted to call, and he asked what his "options" were. According to Detective Jannusch, he answered the defendant by saying that the defendant could cooperate and speak with them or he could go to the booking area and complete the booking process. At his suppression hearing, the defendant stated that the detectives told him that either he could cooperate with them or they could charge him with five or six additional counts on conspiracy and that he could get an additional 30 years added to his prison sentence.

After this exchange, the defendant agreed to discuss his involvement in the robbery. He was again advised of his *Miranda* rights; he acknowledged that he understood them, and he again

signed a written waiver. The detectives then questioned the defendant, writing out their questions and the answers given by the defendant. This handwritten material was then typed; the defendant read it and signed the typed statement.

In the typed statement, the defendant admitted to having between 5 and 10 conversations with Everett concerning plans to rob Wag's. These conversations included details about the best days, hours and managers to rob. He stated that three distinct plans were discussed. The defendant related that in one of the plans he was to leave the rear door of the restaurant open, allowing Everett to enter the rear of the restaurant. On May 7 or 8, he opened the door, per the robbery plan, but quickly closed it to prevent the robbery because he did not like that plan. The defendant also stated that on May 14, prior to going to work, he had been at Everett's apartment and Everett told him that the robbery would take place that night. The defendant said that the robbery went according to plan, with the only difference being that Everett unexpectedly used a knife whereas their plan called for the use of a replica gun. The defendant also admitted that he was to receive half of the stolen money.

At trial, several individuals who often lived at the defendant's apartment testified. Kenneth Rogers testified that he heard the defendant talk about the amount of money in the safe at Wag's. He also stated that he had seen the replica gun and the bike used in the robbery.

Randy Smith, who had also lived with the defendant at one time, testified that he remembered conversations between the defendant and Everett concerning plans to rob Wag's. He stated that the defendant suggested the best times to commit the robbery and explained when the Brinks' truck would be at the restaurant to pick up the money.

Robert Roberts also had lived with the defendant at different times. He testified that the defendant gave advice as to the best time and the best manager to rob, agreed to open the back door to permit the robber to enter, and advised that he should be taken hostage and that he should empty the safe. Roberts also testified that the defendant devised a plan to rob a Brinks' employee picking up money from Wag's. According to Roberts, this plan was attempted but abandoned one week before the actual robbery of Wag's, and that he was present during that attempt. Additionally, he testified that he had seen the replica gun in the defendant's apartment.

The defendant moved to suppress the statement he made to the police after he asked to make a phone call to his attorney. After a hearing, the court denied the defendant's motion, stating that there was no duress, compulsion or pressure used to overcome the defendant's free will.

The defendant first argues on appeal that the trial court erred in denying the motion to suppress his statements. In *Miranda v. Arizona*, the Supreme Court determined that the fifth and fourteenth amendment prohibitions against compelled self-incrimination required that custodial interrogation be preceded by advice to the defendant that he has the right to remain silent and the right to the presence of an attorney. (*Miranda v. Arizona* (1966), 384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 706-07, 86 S. Ct. 1602, 1612.) The Supreme Court expanded this rule in *Edwards v. Arizona* (1981), 451 U.S. 477, 484, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1884, holding that once a defendant invokes his right to have counsel present during interrogation, all questioning must cease until counsel is actually present.

In interpreting *Edwards*, the Illinois Supreme Court has determined that for a defendant to invoke his right to counsel, his request must only be sufficiently free of indecision or double meanings as to reasonably inform the authorities that he wishes to speak to counsel. (*People v. Tackett* (1986), 150 Ill. App. 3d 406, 418, citing *People v. Krueger* (1980), 82 Ill. 2d 305, 311.) Responses to further questioning may not be used to cast a retrospective doubt on the clarity of the initial request for counsel. *People v. St. Pierre* (1988), 122 Ill. 2d 95, 112.

■ In the case at bar, the defendant made a clear and unambiguous request for counsel when he asked to speak to his attorney. (See *St. Pierre*, 122 Ill. 2d at 111.) This invocation of the defendant's right to counsel was understood by the detectives, and their understanding was evidenced by their giving the defendant a phone to call his attorney. See *Tackett*, 150 Ill. App. 3d at 418.

The State argues that the defendant's equivocation about the necessity for his attorney's presence, by asking the detectives what his "options" were and by his subsequent agreement to make a statement, casts a doubt on whether he actually invoked his right to counsel. However, we find that the defendant's request for counsel was unambiguous and free from double meaning. (See *Tackett*, 150 Ill. App. 3d at 418.) His decision to talk to the detectives after he could not reach his attorney may not be used to cast a retrospective doubt on the clarity of his earlier invocation. (*St. Pierre*, 122 Ill. 2d

at 112.) We find that the defendant invoked his fifth amendment right to counsel.

Once the defendant's fifth amendment right has been invoked, he may validly waive this right by voluntarily responding to questioning. (*St. Pierre*, 122 Ill. 2d at 112.) The Supreme Court, in *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830, refined the holding of *Edwards* regarding the test to be used to determine whether a defendant has voluntarily waived his fifth amendment right to counsel after once invoking it. The Illinois Supreme Court, following *Bradshaw*, held the preliminary inquiry to be whether the defendant initiated the conversation in a manner evincing a willingness and a desire for a generalized discussion about the investigation. (*People v. Hicks* (1989), 132 Ill. 2d 488, 493.) The second inquiry is whether, by the defendant's initiation of a conversation, coupled with the totality of the other circumstances, he knowingly and intelligently waived his right to counsel's presence during questioning. *Hicks*, 132 Ill. 2d at 493.

The defendant argues that his second waiver was not valid because the detectives questioned him after he invoked his right to counsel in violation of *Miranda*. Specifically, the defendant refers to the detectives' question, "What do you want to do now?" The defendant asserts that he did not initiate this conversation and that his question about what his options were was an inquiry arising from the incidents of the custodial relationship and his inability to successfully phone his attorney. See *Bradshaw*, 462 U.S. at 1045, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.

The State argues that this dialog does not demonstrate continued police interrogation. The State argues that *Bradshaw* is indistinguishable from this case and argues that the defendant waived his right to counsel when he evidenced a desire for a generalized discussion with the detectives when he said, "What are my options?"

We find that *Bradshaw* is factually distinguishable. In that case, the defendant had invoked his right to counsel and was subsequently being transported to another jail. (*Bradshaw*, 462 U.S. at 1042, 77 L. Ed. 2d at 410, 103 S. Ct. at 2833.) While enroute, upon his own initiative, the defendant asked a police officer, "Well, what is going to happen to me now?" (*Bradshaw*, 462 U.S. at 1042, 77 L. Ed. 2d at 410, 103 S. Ct. at 2833.) The officer answered by saying: "You do not have to talk to me. You have requested an attorney and I don't want you talking to me unless you so desire because anything you say—because—since [*sic*] you have requested an attor-

ney, you know, it has to be at your own free will." (*Bradshaw*, 462 U.S. at 1042, 77 L. Ed. 2d at 410, 103 S. Ct. at 2833.) In this case, on the other hand, when the defendant asked the detectives what his "options" were, they did not inform him that he could make an additional phone call or that he had the right to counsel present before speaking with them. (See, *e.g., Hicks*, 132 Ill. 2d at 493.) Rather, they asked him once again if he would answer their questions. In this context, we find that the detectives' questioning following the defendant's request to call his attorney to be "further police-initiated interrogation." (See *Bradshaw*, 462 U.S. at 1043, 77 L. Ed. 2d at 411, 103 S. Ct. at 2834.) The defendant's subsequent waiver obtained during the interrogation was not valid, and his resulting statements are not admissible. See *St. Pierre*, 122 Ill. 2d at 113.

The defendant argues that because the trial court erred in not suppressing his statement, this court should reverse his conviction. However, reversal is not automatic; the improper admission of involuntary statements can be harmless error. (*Arizona v. Fulminante* (1991), 499 U.S. 279, 284, 113 L. Ed. 2d 302, 314, 111 S. Ct. 1246, 1251.) The determination of harmless error must be analyzed considering the particular facts of each case and considering the record as a whole. (*People v. Myles* (1985), 131 Ill. App. 3d 1034, 1044.) Error is harmless where a reviewing court can safely conclude that a trial, without the error, would produce no different result. *Myles*, 131 Ill. App. 3d at 1044.

In this case, the defendant gave the police statements on May 16, before his custodial arrest. Those statements addressed his discussions about robbing Wag's and were admissible and inculpatory. Additionally, the jury heard the testimony of Joel Clay, Randy Smith, Robert Roberts, and Kenneth Rogers, all of whom testified about the defendant's involvement in the robbery. We find that the improperly admitted statements were at most cumulative, and due to the amount of other inculpatory testimony presented at trial, we find that their admission did not affect the outcome of the case and constituted harmless error. See *People v. Wheeler* (1990), 194 Ill. App. 3d 178, 183.

The defendant next argues that the trial court erred in denying his motion for a new trial, relying on the State's failure to fully comply with discovery and on newly discovered exculpatory information obtained after trial. Specifically, the defendant claims that the State did not disclose the existence of an interview with Joel Worley, a cell mate of Kerry Everett, which included information

tending to negate his guilt. The defendant did not learn of the interview until after his trial.

During the State's investigation, Everett's cell mate was interviewed, and he made a written, signed statement. In that statement, he stated that Everett implicated the defendant in the robbery scheme. After the trial, the defense attorney interviewed the cell mate and obtained an affidavit from him. The cell mate's affidavit directly contradicted his earlier statement to the police and reflected that Everett told him that the defendant was not involved with the robbery.

First, we address whether the State failed to comply with required discovery by failing to divulge the contents of its interview with Everett's cell mate. Supreme Court Rule 412(c) provides that "the State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor." (134 Ill. 2d R. 412(c).) The Illinois Supreme Court has stated, in part, that for the prosecution's suppression of evidence to have violated due process, the evidence discoverable must have been both favorable to the defendant and material either as to guilt or punishment. *People v. Lewis* (1984), 105 Ill. 2d 226, 235.

In this case the interview with Everett's cell mate was not favorable to the defendant since it did not tend to negate the guilt of the defendant. (See *Lewis*, 105 Ill. 2d at 235.) We, therefore, hold that the State did not violate the defendant's due process rights when it did not give the defense counsel the statement of Everett's cell mate. See *People v. Sargent* (1990), 207 Ill. App. 3d 631, 638.

Secondly, we address whether the subsequent affidavit of Everett's cell mate warrants a new trial on the basis of newly discovered evidence. To warrant a new trial, the new evidence must be of such conclusive character that it will probably change the result on retrial. (*People v. Molstad* (1984), 101 Ill. 2d 128, 134.) In this case, even if Everett's cell mate were to testify at a new trial to the information in his affidavit, he would be impeached with his earlier statement. The judge found, in ruling on the defendant's post-trial motion, that the information contained in the affidavit would not be likely to produce a different result. We agree. We find that the trial court did not abuse its discretion in denying the motion for a new trial. See *People v. Gray* (1988), 166 Ill. App. 3d 586, 591-92.

The defendant next argues that the court erred in refusing to give instructions to the jury proposed by the defendant and in giving certain instructions over the defendant's objections. We will address each contested instruction separately.

The defendant argues that the court erred when it refused to give the jury the accomplice instruction with respect to the testimony of Robert Roberts. (See Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981) (hereinafter IPI Criminal 2d).) Essentially, this instruction states that the testimony of an accomplice should be considered with suspicion. The defendant argues that Robert Roberts' testimony that he had been involved in the planning of another robbery with the defendant made him an accomplice, although not to the crime in question, entitling him to the cautionary statement to the jury.

■ The accomplice instruction should be given "[w]hen a witness says he was involved in the commission of a crime with the defendant." (IPI Criminal 2d No. 3.17.) The use of this instruction has been expanded to encompass those cases where probable cause exists to indict the witness as a principal or accessory. (*People v. Cobb* (1983), 97 Ill. 2d 465, 476.) However, the Illinois Supreme Court recently stated that an accomplice is not one who was an admitted participant in an offense distinct from the one at bar, even if that offense was related to the charge at issue. *People v. Henderson* (1990), 142 Ill. 2d 258, 314-17.

■ In this case, Roberts may have been a participant in a related crime, but this does not qualify him as an accomplice. (*Henderson*, 142 Ill. 2d at 314-17.) We hold that the court did not err in refusing to give this instruction.

The defendant next argues that the court erred by giving the accountability instruction to the jury over his objection. (See Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c); IPI Criminal 2d No. 5.03.) It is a well-settled rule that a jury in a criminal case may be instructed as to any theory of the case that may reasonably be inferred from the facts. (*People v. Carr* (1986), 149 Ill. App. 3d 918, 929-30.) The prosecution, as well as the defense, is entitled to appropriate instructions which present its theories of the case, if such theories are supported by the evidence. (*Carr*, 149 Ill. App. 3d at 930.) Even slight evidence that a defendant participated in any part of a crime will justify the giving of an accountability instruction. *People v. Daniels* (1985), 139 Ill. App. 3d 475, 479.

■ In the case at bar, the State's theory was that of accountability. The testimony at trial was replete with evidence that the

defendant engaged in the planning of the Wag's robbery. We find that based upon the evidence presented at trial the court did not err in instructing the jury on the issue of accountability. See *Daniels*, 139 Ill. App. 3d at 479.

■ The defendant also objects to the circumstantial evidence instruction given over the defense's objection. Circumstantial evidence is the proof of facts or circumstances which tend to show the guilt or innocence of the defendant. (IPI Criminal 2d No. 3.02.) It has been held proper to give this instruction if there is circumstantial evidence tending to link the defendant with the crime. (*People v. Levine* (1981), 99 Ill. App. 3d 141, 167.) In the instant case, the circumstantial evidence, being the money, gun and clothing items, was evidence which tended to link the defendant to the crime, as some of the items were seen in the defendant's apartment. We hold the court did not err in giving the jury the instruction on circumstantial evidence. See also *Carr*, 149 Ill. App. 3d at 929-30.

The defendant next argues on appeal that the trial court erred in sentencing him to more than the minimum sentence of six years for his Class X felony. The defendant cites his lack of criminal background, his age and his degree of participation in the robbery as mitigating factors. When the court sentenced the defendant, the judge stated that due to the planned nature of the offense the defendant should receive more than the minimum sentence allowed. After reviewing the presentence report, allowing for corrections, and giving the defendant an opportunity to speak, the judge sentenced the defendant to eight years' imprisonment, two years over the statutory minimum.

■ Reviewing courts will not overturn the sentencing decision of a trial court, absent an abuse of discretion. (*People v. Peve* (1991), 209 Ill. App. 3d 1021, 1024.) Furthermore, reviewing courts will not substitute their judgment for that of the trial court merely because they might have balanced the sentencing factors differently. (*People v. Rogers* (1986), 141 Ill. App. 3d 374, 382.) As stated by our supreme court in *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, a reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case. In this case, the court could have sentenced the defendant to between 6 and 30 years. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(3).) The judge, however, gave the defendant two years over the statutory minimum and explained his reasoning. (See *People v. Robinson* (1987), 163 Ill. App. 3d 384, 396.) We find no abuse of dis-

cretion in the trial court's sentencing. *Peve*, 209 Ill. App. 3d at 1024.

The defendant next argues on appeal that his conviction must be reversed because he was never charged under an accountability theory pursuant to section 5—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 5—2) but was charged only as the principal actor in the offense.

■■ The law of accountability provides that where two or more individuals engage in a common criminal design, any acts committed by one party are considered the acts of all. (See *People v. Fyke* (1989), 190 Ill. App. 3d 713, 720.) An indictment charging a defendant as principal will also support the conviction of the defendant under the theory of accountability. (*People v. Lawson* (1990), 193 Ill. App. 3d 396, 399.) In this case, the jury was given the instruction on the State's theory of accountability. We find that there was no error in failing to charge the defendant as an accomplice. See *Lawson*, 193 Ill. App. 3d 396.

The defendant lastly argues that he was not found guilty beyond a reasonable doubt. He argues that there was not sufficient evidence to link his conversations with Everett to the actual robbery of Wag's.

■■ Once a defendant had been found guilty by a jury, a reviewing court should affirm their decision if any rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could have found the defendant guilty beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) In this case, the defendant admitted to several conversations with Everett about robbing Wag's, and there is testimony from several others that the defendant provided Everett information relating to the best time and manner to rob his place of work. Even omitting consideration of the defendant's inadmissible statements, we find no insufficiency of evidence to support reversal of the conviction. See *Collins*, 106 Ill. 2d at 262.

Based on the foregoing, we affirm the judgment of the circuit court of Kane County.

Affirmed.

McLAREN and NICKELS, JJ., concur.