THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALAN WYCH, Defendant-Appellant.

Second District   No. 2—91—0803

Opinion filed August 5, 1993.

G. Joseph Weller and Ingrid L. Moller, both of State Appellate Defender's Office, of Elgin, for appellant.

Roger T. Russell, State's Attorney, of Belvidere (William L. Browers, Robert J. Biderman, and James Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

Following a bench trial in the circuit court of Boone County, defendant, Alan Wych was convicted of a single count of criminal sexual assault (720 ILCS 5/12—13 (West 1992)) and was sentenced to a four-year term of imprisonment. Defendant appeals, contending that the State failed to prove his guilt beyond a reasonable doubt and that the trial court erred in denying his motion to suppress certain statements he made to police after requesting an attorney.

The evidence presented at trial was as follows. On December 7, 1989, M.B. was living with her niece, Brenda Blodgett, and Brenda's husband, Paul Blodgett, at their house in Belvidere. Also living in the house and present that night were Brenda's daughter and Mike Richardson, a friend of the Blodgetts who was staying in their finished basement. M.B. testified that, at about 10 p.m. on December 7, she had gone to sleep on the couch in the living room. At about 11:30 p.m. she awoke and found defendant lying on top of her with his penis inside her vagina. Defendant said "f--- me" to M.B. M.B. asked defendant "what the hell he [thought] he was doing," at which point

defendant jumped up and ran out a patio door. M.B. got up and saw defendant drive away in a red car. M.B. had known defendant for 10 years or longer, but they had never had any kind of romantic relationship.

That evening, M.B. slept in a flannel gown which came down about six inches below her knees. She testified that when she awoke with defendant on top of her, the gown was pulled up over her stomach and she was exposed from the waist down. Later, during cross-examination, M.B. stated that her clothes were pulled up to her neck. Defendant did not hit M.B. or tear her clothes. M.B. didn't scream, bite, scratch, or kick defendant. M.B. had been drinking earlier that day. During the period from about 3:30 p.m. until she went to bed, M.B. had about seven beers and three shots. She was relaxed but not intoxicated.

After defendant left, M.B. went to Paul and Brenda's bedroom and told them that she had been raped, at which point Brenda contacted the police. Paul and Brenda testified that M.B. was crying when she told them that she had been raped. M.B. was later taken to St. Anthony's Hospital in Rockford. A nurse who attended to M.B. testified that M.B. appeared very upset and started to cry while being examined. During the examination, a pubic hair was found in M.B.'s vaginal area. The hair was examined at the Illinois State Police Crime Laboratory and was found to be dissimilar to samples taken from M.B. While the hair was found to be consistent with a sample taken from defendant, its origin could not be conclusively determined. No seminal material or spermatozoa was found in the examination of M.B.

Early in the morning of December 8, 1989, defendant was questioned in an attorney room at the Boone County jail by Detectives Royal White and Joseph Gough of the Belvidere police department. Prior to questioning, defendant was advised of his *Miranda* rights. Defendant indicated that he understood his rights and signed a waiver form. Thereafter, defendant told the detectives that he went to Paul Blodgett's house to talk to Paul about some money Paul owed him. When he got to the house and could not make contact with Paul, he went downstairs and talked to Michael Richardson. After a short time, he left Richardson and returned upstairs. Upon doing so, he noticed someone on the couch trying to get his attention and motioning for him to come over. Defendant told the detectives that he messed around with the person on the couch a little bit and then left. Asked by the detectives whether he had intercourse with the person on the

couch, defendant stated that he had not and had never taken his pants down.

At that point defendant asked if he could speak to his attorney, and defendant placed a telephone call to an attorney outside of the presence of Detectives White and Gough. After the call was completed, Detective White asked defendant if he had contacted his attorney, and defendant responded that he had. White then asked defendant whether he wanted to continue talking to the detectives, and defendant stated that his attorney told him to keep quiet. White then told defendant that he and Gough would stop asking questions. Defendant replied that he wanted to continue talking but would refuse to answer questions that he thought he should not answer.

After this exchange, defendant told White that there was a lot of drug trafficking going on in the Blodgetts' residence, and he expressed his desire to make a deal. White responded that he was not in a position to make a deal with the police. White told the defendant he would review the case and would then inform defendant with what offense he would be charged. Detectives Gough and White then left.

White later returned without Detective Gough to serve defendant with the complaint charging criminal sexual assault. According to White, during this encounter, defendant stated that he could not believe M.B. was doing this to him. White again asked defendant if he was sure he did not have sex with M.B., and defendant responded that he did not think so. According to White, defendant further stated, "Royal, if I did this I was more drunk and more fucked up than I thought I was, but I don't think I did it." Defendant also indicated that he did not know the person on the couch was M.B. until he was on top of her, at which point he recognized her. Defendant was coherent during his discussions with White and did not appear to White to be under the influence of alcohol.

Paul Blodgett testified that he had known defendant for about 20 years. At one point defendant had worked for Paul in his seamless gutter business before defendant went into business for himself. Paul was also married to defendant's sister, Tina, at one time. They were divorced in 1976 but had lived together a few times thereafter. On one occasion, Paul struck Tina in defendant's presence, and defendant responded by striking Paul. According to Paul, there was no ill will between him and defendant as a result of Paul's divorce from Tina, nor did any conflict arise from competition between them in the seamless gutter business.

According to Paul's testimony, at around 9 a.m. on December 8, 1989, he received a telephone call from defendant, who asked to

speak to M.B. When Paul refused to allow defendant to talk to M.B., defendant asked Paul if he would talk to M.B. for him. Defendant indicated that he wanted to get M.B. an apartment and pay her rent for the first two or three months. Defendant also indicated that he wanted M.B. to drop the charges against him. Defendant repeated several times his desire that M.B. drop the charges against him and his willingness to rent an apartment for M.B. About one-half hour later, defendant called Paul again and mentioned that he had been arraigned and did not have enough money for bond. Defendant again discussed helping M.B. rent an apartment and M.B. dropping the charges. Defendant also discussed selling Paul his car for $1,500 so that he could get out of jail. Paul testified that, during their conversation, defendant stated that he had been drinking the night before and "didn't remember being there." Paul asked defendant if he "did it" and defendant responded, "[w]ell, I don't know why I did it." Defendant wanted to apologize to M.B. for "doing it."

Defendant testified that, on the evening of December 7, 1989, he and two friends had gone to two bars in Rockford and Beloit, Wisconsin. After returning to Belvidere, defendant asked one of his friends if he wanted to go to Paul Blodgett's house to play pool and drink beer. Defendant also wanted to collect some money Paul owed him. They proceeded to the Blodgetts' residence, and defendant was let into the house while his friend apparently waited in the car. When defendant learned that Paul was sleeping, he went down to the basement and spoke briefly to Mike Richardson. Testifying for the State, Richardson confirmed the conversation. Defendant testified that, when he returned upstairs after his conversation with Richardson, he noticed someone on the couch motioning to him. Defendant could not tell who it was at first. The person on the couch asked if she could have a kiss before defendant left, and defendant thought it was M.B. because she often asked for a kiss. He gave her a kiss, and they started to "fool around a little bit." When defendant was rubbing M.B.'s leg, she said "what are you doing," at which point defendant got up and left.

After leaving the Blodgetts' house, defendant visited a friend and went home at around 2 a.m. When he arrived at home, defendant was informed by his sister that the police were looking for him. Defendant contacted the police and was taken to the police station. Defendant denied telling Detective White that, if he had sex with M.B., he was more fucked up than he thought. Rather, defendant said to White, "you would have to be awful f---ed up to do that." Defendant confirmed that he had called Paul Blodgett and asked him to talk to M.B.

about dropping the charges. Defendant also confirmed offering to sell Paul his car and to get M.B. an apartment and pay the rent for a few months. Defendant testified he offered to help M.B. with an apartment because he felt sorry for her. Defendant denied admitting to Paul that he had done anything wrong.

The defense also presented the testimony of Curt Swanson. Swanson testified that around Thanksgiving 1989 he observed an exchange between M.B. and defendant in a bar where Swanson was employed as a bartender. On this occasion, according to Swanson, M.B. asked defendant for a kiss and a ride home, and defendant refused.

Prior to trial, defendant filed a motion to suppress the statements he made to police, contending that he was not advised of his rights pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and that his statements were coerced. The parties agreed to permit the trial court to rule on the motion after hearing the trial testimony. After the close of evidence, the trial court noted that it had been shown that defendant was properly advised of his *Miranda* rights. However, the trial court questioned the propriety of admitting statements defendant made to police without an attorney present after an attorney had been requested. At that time, defendant's attorney took the position that such statements were inadmissible. The trial court invited the parties to submit authority on the question and took the matter under advisement. Subsequently, on May 6, 1991, the trial court denied the motion to suppress and found defendant guilty of the offense charged.

Defendant initially contends that the evidence presented by the State was insufficient to prove his guilt beyond a reasonable doubt. At the outset, we note that, while at one time the law in Illinois required that the victim's testimony must be clear and convincing or substantially corroborated to sustain a conviction for a sex offense, that standard has been rejected. (*People v. Schott* (1991), 145 Ill. 2d 188, 202-03; see also *People v. Wittenmyer* (1992), 151 Ill. 2d 175, 190; *People v. Dugan* (1992), 237 Ill. App. 3d 688, 699.) In sex offense cases, as in other criminal cases, the test to be employed on review when the sufficiency of the evidence is questioned is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261; see *Schott*, 145 Ill. 2d 188; *People v. Grant* (1992), 232 Ill. App. 3d 93.) This standard of review does not allow the appellate court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses.

(*People v. Sutherland* (1992), 155 Ill. 2d 1, 17; *Dugan*, 237 Ill. App. 3d at 699.) A reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Sutherland*, 155 Ill. 2d at 17; *Dugan*, 237 Ill. App. 3d at 699; *People v. West* (1992), 234 Ill. App. 3d 578, 588.

■ Defendant contends that M.B.'s testimony that she awoke and found defendant on top of her with his penis in her vagina was implausible and contrary to human experience and nature. Defendant argues that it is unreasonable to believe that he could climb on top of M.B., expose her and attempt penetration without waking her. Defendant maintains that M.B. would have awakened before he could have accomplished penetration. We disagree. If defendant made an effort not to wake M.B., it is plausible that she could remain asleep at the beginning of the incident. It is a matter of common experience the individuals sleeping soundly can often be subjected to some physical contact or manipulation without being roused from sleep. In the present case, it has not been suggested that defendant was on top of M.B. or had his penis in her vagina for a lengthy period of time before she awoke. Moreover, while M.B. testified that she was not intoxicated that evening, she had consumed a considerable amount of alcohol which could have contributed to her sleeping soundly.

Defendant also notes the lack of any outcry or resistance by M.B. after she awoke. M.B.'s testimony indicates that defendant fled moments after she awoke and that she had asked him what he was doing. The record discloses that M.B. was disoriented and not fully alert when she awoke to find defendant lying on top of her, which would satisfactorily explain her failure immediately to cry out or offer resistance. After defendant left, M.B. was visibly distressed. M.B. promptly reported the incident to Paul and Brenda Blodgett, who then contacted the police. Additionally, Paul and Brenda Blodgett and a nurse who attended to M.B. at St. Anthony's Hospital testified that M.B. was crying. M.B.'s prompt complaint and the fact that she was observed crying corroborate her account that she was sexually assaulted. See, *e.g., People v. Bock* (1993), 242 Ill. App. 3d 1056, 1078 (testimony of police and medical personnel that complainant was emotionally upset and crying was corroborative); *People v. Shockley* (1990), 195 Ill. App. 3d 148 (prompt complaint was corroborative).

In support of his argument that the evidence against him was insufficient to sustain his conviction, defendant cites two cases which are factually dissimilar to the case at bar. In *People v. Wright* (1986), 147 Ill. App. 3d 302, a rape conviction was reversed where the com-

plainant's testimony was that she had been abducted in daylight after stepping off a bus and, over a period of several hours, was forcibly taken by her unarmed abductor to a number of public places where without screaming or appearing distraught she unsuccessfully sought help.

In *People v. Appleby* (1968), 104 Ill. App. 2d 207, the complainant testified that she was raped by an intruder in her bed where her four children were also sleeping. None of the children awoke during the approximately 15 minutes the intruder was in the bedroom. Under the evidentiary standard applicable at the time, requiring uncorroborated testimony in a rape prosecution to be clear and convincing, the *Appleby* court reversed the conviction. The court expressed doubt as to the reliability of the complainant's identification of the defendant and as to her testimony that none of her children were awakened during the incident. But see *People v. Grant* (1992), 232 Ill. App. 3d 93 (where 13-year-old complainant's identification of defendant as her assailant was clear and unequivocal, testimony that sexual assault occurred in same bedroom where four of the complainant's siblings were sleeping and in same bed where two of those siblings were sleeping did not create a reasonable doubt).

Neither case cited by defendant has much bearing on the determination of the plausibility of M.B.'s testimony in the present case. M.B.'s testimony was not so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of defendant's guilt. Accordingly, the trial court's finding will be affirmed.

■ Defendant next contends that the trial court erred in denying his motion to suppress statements he made to police after telephoning his attorney. Although defendant was permitted to speak to his attorney, he contends that the police improperly resumed questioning and that statements he made without counsel present were inadmissible. The State initially responds that defendant has waived this argument because he did not raise the issue in his original written motion to suppress. The basis for defendant's written motion to suppress was his contention that he had not been properly advised of his *Miranda* rights before questioning and that his statements were coerced. Generally, arguments raised for the first time on appeal are deemed waived. (*People v. C.H.* (1992), 237 Ill. App. 3d 462, 467, citing *People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Although defendant did not raise in his written motion to suppress the specific issue presently before this court, during arguments on the motion the trial court brought the issue to the attention of counsel for the State and defendant, at which point the defense counsel stated that the actions of the

interrogating detectives which are the subject of this appeal were improper. The trial court invited counsel to submit authorities on the issue and considered the issue in ruling on the suppression motion. Under these circumstances the issue has not been waived, and we will consider the merits of defendant's argument.

The privilege against self-incrimination is guaranteed by the fifth amendment to the United States Constitution. (See, *e.g., People v. Edwards* (1991), 144 Ill. 2d 108, 136.) In *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the United States Supreme Court held that the fifth amendment privilege against self-incrimination applies where an individual is subjected to custodial interrogation. To protect the privilege in this setting, the Court set forth certain procedural safeguards which must be employed, the most important of which is that, prior to interrogation, the defendant must be informed in clear and unequivocal terms that he has the right to remain silent. (*Miranda*, 384 U.S. at 467-68, 16 L. Ed. 2d at 720, 86 S. Ct. at 1624.) To further safeguard the privilege against self-incrimination, the Court declared that a defendant must be permitted to have an attorney present during interrogation if he desires and must be advised of that right. (*Miranda*, 384 U.S. at 469, 16 L. Ed. 2d at 721, 86 S. Ct. at 1625.) The ability merely to consult with counsel prior to questioning is not enough, since "preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process." *Miranda,* 384 U.S. at 470, 16 L. Ed. 2d at 721, 86 S. Ct. at 1625.

Our supreme court has recently outlined the procedures to be followed after *Miranda* warnings are given:

"If a suspect indicates that he wishes to remain silent, the interrogation must cease. (*Miranda*, 384 U.S. at 474, 16 L. Ed. 2d at 723, 86 S. Ct. at 1628.) If a suspect invokes his right to counsel in response to *Miranda* warnings, all interrogation must cease until an attorney is present. (*Miranda*, 384 U.S. at 474, 16 L. Ed. 2d at 723, 86 S. Ct. at 1628; see also *Minnick v. Mississippi* (1990), 498 U.S. 146, 112 L. Ed. 2d 489, 111 S. Ct. 486.) The Court in *Miranda* thus 'fashioned *** the rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights.' *Fare v. Michael C.* (1979), 442 U.S. 707, 719, 61 L. Ed. 2d 197, 209, 99 S. Ct. 2560, 2569." *People v. Winsett* (1992), 153 Ill. 2d 335, 349.

In *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, the Supreme Court reconfirmed the principles of *Miranda,* emphasizing that "it is inconsistent with *Miranda* and its

progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." (451 U.S. at 485, 68 L. Ed. 2d at 387, 101 S. Ct. at 1885.) In *Edwards*, the interrogating officers suspended an initial session of questioning when the defendant, having previously been advised of his rights pursuant to *Miranda*, requested an attorney. The next morning the defendant was taken to meet with two detectives, colleagues of the officers who had previously questioned him. After *Miranda* warnings were again administered, the defendant made statements implicating himself in the crime under investigation. The Court acknowledged that a defendant who has been initially advised of his *Miranda* rights may himself validly waive his rights and respond to interrogation, but the Court noted that "additional safeguards are necessary when the accused asks for counsel." (451 U.S. at 484, 68 L. Ed. 2d at 386, 101 S. Ct. at 1884.) Accordingly, the Court held as follows:

"[W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused *** having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities unless counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*" (Emphasis added.) 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1884-85.

In its recent decision in *People v. Winsett* (1992), 153 Ill. 2d 335, 349-50, our supreme court observed:

"*Edwards* thus created a bright-line rule for deciding whether an accused who has invoked his fifth amendment right to counsel has subsequently waived that right. Any waiver of the right to counsel given in a discussion *initiated by the police* is presumed invalid, and statements obtained pursuant to such a waiver are inadmissible in the prosecution's case in chief." (Emphasis added.)

In *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830, the Court made clear that the fact that an accused initiates further communication with authorities does not alone establish a valid waiver of the right to counsel during interrogation. Our supreme court has observed that under *Bradshaw* it must also be shown that "by defendant's initiation of a conversation, coupled with

the totality of the other circumstances, he knowingly and intelligently waived his right to counsel's presence during questioning." *People v. Hicks* (1989), 132 Ill. 2d 488, 493.

In the present case, defendant invoked the right to counsel when he asked if he could speak to his lawyer. At that point the principles of *Edwards* became applicable. While *Edwards*, by its language, prohibits police-initiated reinterrogation where the accused has "expressed his desire to deal with the police only through counsel" (451 U.S. at 484, 68 L. Ed. at 386, 101 S. Ct. at 1885), applicable decisions have not required defendants requesting counsel to request specifically their presence during interrogation for purposes of invoking the right to counsel under *Edwards*. (See, *e.g., People v. Carlson* (1992), 224 Ill. App. 3d 1034; *People v. Parham* (1986), 141 Ill. App. 3d 149.) The settled approach to questions of waiver requires courts to give a broad, rather than a narrow, interpretation to a defendant's request for counsel. *Michigan v. Jackson* (1986), 475 U.S. 625, 633, 89 L. Ed. 2d 631, 640, 106 S. Ct. 1404, 1409. But see *Connecticut v. Barrett* (1987), 479 U.S. 523, 526, 93 L. Ed. 2d 920, 926, 107 S. Ct. 828, 830 (where defendant's statement that "he was willing to talk about [the incident under investigation] verbally but he did not want to put anything in writing until his attorney came" was not ambiguous so as to require a broad interpretation, and did not invoke the right to presence of counsel while the defendant made an oral statement).

When defendant asked to speak with his attorney, the detectives questioning him were required immediately to cease the interrogation. The detectives complied with this requirement and permitted defendant to call his attorney. Having invoked the right to counsel, any waiver of that right in a discussion *initiated by police* would be presumed invalid, rendering any statements obtained pursuant to such waiver inadmissible. (*People v. Winsett* (1992), 153 Ill. 2d 335, 350.) Defendant urges that the waiver relied upon by the State in the present case was given in a conversation initiated by the detectives and was therefore invalid.

■ After defendant completed his telephone call to his attorney, Detectives White and Gough asked him if had contacted his attorney, and defendant responded affirmatively. Detective White then asked defendant if he wanted to continue talking to the detectives. When the defendant responded that his attorney advised him to remain silent, Detective White unequivocally stated that the questioning would end at that point. Clearly, after the defendant completed the call to his attorney, the detectives initiated a conversation or discussion with the defendant in the ordinary sense of those terms. However, for pur-

poses of *Edwards*, that brief exchange was completed when Detective White stated that no further questions would be asked. At that point, the detectives had obtained all the information they sought from defendant, and White's final statement invited no further response from defendant. When defendant immediately thereafter stated, without any prompting from the detectives, that he would answer questions as he deemed advisable, *he* initiated a new conversation pursuant to which he waived the right to have an attorney present. Although defendant's statement immediately followed Detective White's, we do not believe the passage of time necessarily controls the question of when one exchange or conversation has ended and another begun. Rather, the limited purpose of the exchange initiated by the detectives and the clarity with which the detectives ended their inquiry convince us that the defendant's subsequent unsolicited offer to answer additional questions initiated a new discussion. The *Edwards* rule is designed to prevent the police from badgering a defendant into waiving his previously asserted *Miranda* rights. (*Winsett*, 153 Ill. 2d 335.) Where the authorities, without threatening reprisal or suggesting negative repercussions, have unequivocally indicated that questioning would terminate, it would not advance the purpose of the *Edwards* rule to suppress unsolicited statements made by the defendant.

We find support for our conclusion in the decision in *People v. Weathersby* (1985), 138 Ill. App. 3d 310. In *Weathersby*, while *Miranda* warnings were being read to the defendant, he made comments from which the detectives present concluded he was invoking his right to counsel. As the detectives were leaving, the defendant requested coffee and a cigarette and stated that he would tell what really happened. On appeal from the denial of his motion to suppress statements made thereafter, the court expressed doubt whether the defendant had effectively invoked his right to counsel, but stated that "[m]ore important is the fact that as the police began to leave in deference to their perception that defendant was requesting counsel, it was defendant who initiated further communication with them." (138 Ill. App. 3d at 315.) Applying *Edwards*, the *Weathersby* court concluded that "assuming that defendant's statements were properly construed as a request for counsel, it is clear that he immediately initiated a new conversation in which he waived this request." (138 Ill. App. 3d at 315.) Similarly, in the case at bar, defendant's statement that he would answer certain questions initiated a new conversation.

In support of his argument that his statements should have been suppressed, defendant relies, in part, on this court's recent decision in

*People v. Carlson* (1992), 224 Ill. App. 3d 1034, where we found that statements made after the defendant's request for counsel should have been suppressed. In *Carlson*, after requesting an attorney, the defendant was permitted a telephone call, but was unable to reach his attorney. Thereafter, one of the detectives questioning the defendant asked him, "What do you want to do now?" (224 Ill. App. 3d at 1040.) The defendant asked what his "options" were, and the detective responded that the defendant could cooperate and speak with the detectives or he could go to the booking area and complete the booking process. (224 Ill. App. 3d at 1040.) The basis for this court's decision that the defendant's subsequent statements should have been suppressed was as follows:

> "[W]hen the defendant asked the detectives what his 'options' were, they did not inform him that he could make an additional phone call or that he had the right to counsel present before speaking with them. [Citation.] Rather, they asked him once again if he would answer their questions. In this context, we find that the detectives' questioning following the defendant's request to call his attorney to be 'further police-initiated interrogation.' " 224 Ill. App. 3d at 1041.

*Carlson* is distinguishable. In the case at bar, defendant actually spoke to his attorney; he was not faced with the decision of how to proceed when counsel appeared to be unavailable, nor were his options in any way misrepresented. Moreover, as previously noted, in the present case, unlike *Carlson*, the detectives' unequivocal termination of questioning intervened prior to defendant's announcement that he would answer certain questions.

We therefore conclude that defendant initiated the communication in which he waived the right to have counsel present during questioning. The remaining inquiry is whether, by defendant's initiation of a conversation, coupled with the totality of the other circumstances, he knowingly and intelligently waived the right to have counsel present. (*People v. Hicks* (1989), 132 Ill. 2d 488, 493.) Defendant has not disputed that the waiver was knowingly and intelligently made. Defendant was properly advised of his rights and was permitted to speak with his attorney. The record supports the conclusion that defendant knowingly and intelligently waived the right to have an attorney present during questioning.

A trial court's ruling on a motion to suppress will not be overturned unless it is manifestly erroneous. (*People v. Galvin* (1989), 127 Ill. 2d 153, 162; *People v. Pertz* (1993), 242 Ill. App. 3d 864, 892.) The

trial court's denial of defendant's motion to suppress is supported by the evidence and will be affirmed.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

McLAREN and GEIGER, JJ., concur.